**Robert G. MOORE, and Frances R. Moore, Plaintiffs,**

**v.**

**UNITED STATES of America, Defendant.**

**Action No. 2:94cv517.**

United States District Court, E.D. Virginia, Norfolk Division.

June 6, 1996.

Lawrence Hunter Woodward, Jr., Shuttle-
worth, Ruloff & Giordano, Douglas Eugene

Kahle, Pender & Coward, Virginia Beach, VA, plaintiffs.

Gregory D. Stefan, United States Attorney's Office, Norfolk, VA, Michael J. Martineau, Trial Attorney, Tax Division, U.S. Dept. of Justice, Washington, DC, for defendant.

## OPINION

MacKENZIE, District Judge.

The Plaintiffs in this tax case, Robert G. and Frances R. Moore ("the Moores"), seek a refund of $47,477 in taxes they allege were erroneously assessed and collected by the Defendant, the United States of America ("the Government"), acting through the Internal Revenue Service ("IRS"), for the 1986 tax year.[1] The Government has filed a counterclaim for $290,763 in unpaid taxes and interest for the 1986 tax year. Jurisdiction in this Court is proper pursuant to 28 U.S.C. § 1346(a)(1) and (c) (1994) and 26 U.S.C. § 7401 (1994). For the reasons set forth in the opinion below, the Moores' tax refund claim is DENIED; the Government's counterclaim is also DENIED.

## I. BACKGROUND

The parties have stipulated that the Court must resolve four discrete and fact-intensive issues in this case. Accordingly, the facts pertinent to each issue will be recounted separately.

### A.

On October 1, 1988, the Moores purchased a 59.7 acre parcel of land in Chesapeake, Virginia known as the "Boy Scout Tract." (Compl. ¶ 6; Def.'s Post–Trial Br. at 4.) The parcel was intended for residential development in conjunction with an adjacent 632 acre parcel in which the Moores had a partnership interest. (Pls.' Post–Trial Brief at

2.) In 1988, the Moores' real estate appraiser, Bruce Hatfield, determined that the fair market value of the Boy Scout Tract was $1,025,000. (R. at 113.)

After acquiring the Boy Scout Tract, the Moores hired Doug Davis ("Davis"), an environmental consultant, to perform a wetlands assessment[2] to determine the percentage of the Boy Scout Tract protected under the 1987 Wetlands Manual ("the 1987 Manual"), published by the Government through the United States Army Corps of Engineers ("the Corps"). Although the record is not clear as to Davis' precise findings in his 1988 assessment, (compare R. at 83–85 (Davis testifying that his initial wetlands assessment of the Boy Scout Tract was inconclusive but generally showed that the property was primarily non-wetland) with R. at 130 (Mr. Moore testifying that Davis "gave me an opinion that it was all wetlands")), Davis apparently concluded that in 1988 the Moores could have reasonably expected to be able to develop the Boy Scout Tract in a commercially feasible manner. (R. at 83–84.)

Early in 1989, the Government, acting through the Corps and the Environmental Protection Agency ("EPA"), adopted the 1989 Wetlands Manual ("the 1989 Manual"). (R. at 25–28, 59, 81.) The 1989 Manual superseded and significantly changed the 1987 Manual's criteria for identifying protected wetlands. (R. at 25–28.) One study indicates that the 1989 Manual had the effect of increasing the amount of protected wetlands in the Tidewater region in Southeastern Virginia by 36,000 acres. (R. at 28.)

In late 1989, the Corps and the EPA signed a Memorandum of Agreement ("1989 Memorandum Agreement"), which effectively reinterpreted the EPA guidelines the Corps had to apply in issuing development permits under § 404 of the Clean Water Act, 33 U.S.C. § 1251 et seq. (1994). (R. at 29, 197.)

1. The parties have stipulated that although the tax year at issue in the present case is 1986, the controversy revolves around certain losses and deductions the Moores took on their 1989 tax return, which losses and deductions they properly carried back to the 1986 tax year. (Order on Final Pre–Trial Conference at ¶ (1)(g).)

2. Apparently, a wetlands assessment is one of three types of wetlands studies performed by

environmental consultants: 1) a wetlands reconnaissance; 2) a wetlands assessment; and 3) a wetlands delineation. Of these three types of studies, a wetlands delineation is the most specific and highly refined process of identifying the amount of jurisdictional wetlands in a particular parcel of land. (R. at 60–62.)

The 1989 Memorandum Agreement had two principal effects: 1) it established a national policy of no net loss of wetlands, in accordance with a directive from President Bush; and 2) it established a uniform sequence of analyses for the evaluation of § 404 permits, a process which apparently came to be known as mitigation sequencing. (R. at 29, 196–98.)

The 1989 Memorandum Agreement had a dramatic effect on the process of obtaining a § 404 permit. Mitigation sequencing required an applicant to complete a three-stage process before receiving a § 404 permit. (R. at 29, 198.) The first stage—avoidance—required the applicant to show that the development plan was the "least environmentally damaging practical alternative," i.e. that the applicant could not have avoided impacting wetlands by developing alternative parcels of property, whether owned by the applicant or not. (R. at 29–30, 198–99.) The second stage—minimization—required the applicant to justify the extent of the wetlands impact the development project would have. (R. at 30, 199.) The last stage—compensation—required the applicant to create at least as many acres of wetlands as would be impacted by the development project in order to prevent any net loss of wetlands. (R. at 30–31, 199.) Three (3) experts testified on behalf of the Moores that the 1989 Memorandum Agreement had the effect of making it exceedingly difficult to acquire a permit under § 404 of the Clean Water Act. (See R. at 53, 206.)

In their 1989 tax return, the Moores claimed a deduction under I.R.C. § 165 for the regulatory taking of the Boy Scout Tract, which they treated as an involuntary conversion loss under I.R.C. § 1231(a). (Pls.' Post–Trial Br. at 11; Def.'s Post–Trial Br. at 6.) The Moores' claimed deduction for the Boy Scout Tract gave them a net operating loss for the 1989 tax year, which loss they carried back to their 1986 return. (Compl. at ¶ 12.) The IRS audited the Moores' 1989 tax return, disallowed the § 1231 loss, and consequently assessed an income tax of $47,477 against the Moores for the 1986 tax year. (Compl. at ¶¶ 13–14.) The Moores paid the assessed tax and now seek a refund in this Court. (Compl. at ¶¶ 14–16.)

### B.

In 1989, the Moores were in the process of developing fifteen (15) subdivisions located in various locations across the Tidewater region. (Pls.' Post–Trial Br. at 11; Def.'s Post–Trial Br. at 33.) Within those subdivisions, the Moores sold a number of houses and attempted to rent the houses they could not sell. (Pls.' Post–Trial Br. at 11; Def.'s Post–Trial Br. at 33.) In eight (8) of those subdivisions, the Moores receipts from rental properties were less than 20% of receipts from sales and rentals combined. (Pls.' Post–Trial Br. at 11; Def.'s Post–Trial Br. at 33.) The characterization of the rental receipts from these eight (8) scattered subdivisions is the crux of the first issue raised by the Government in its counterclaim.

The Moores classified each of their subdivisions as a separate business undertaking for purposes of completing their 1989 tax return. (Pl. Post–Trial Br. at 12.) This classification enabled the Moores to characterize the financial losses they incurred from renting properties in each of the eight (8) subdivisions at issue as non-passive activity losses, pursuant to I.R.C. § 469 and the Treasury Regulations interpreting that section. So characterized, the losses from rental activity in the eight (8) subdivisions contributed to the 1989 net operating loss which the Moores carried back to their 1986 tax return. (Pls.' Post–Trial Brief at 12; Def.'s Post–Trial Br. at 33.) In its counterclaim, the Government contends that the Moores' treatment of each subdivision as a separate business undertaking was an artificial contrivance designed to reduce the Moores' tax liability by enabling them to characterize rental receipts in the eight (8) subdivisions at issue as non-passive activity losses. (Def.'s Post–Trial Br. at 38.)

### C.

For a number of years in the 1980s, the Moores hosted an annual party in December for a few hundred business associates. (Def.'s Post–Trial Br. at 40; Pls.' Post–Trial Br. at 13.) The annual party typically in-

cluded a cocktail hour, a seated dinner, dancing, and live entertainment by a nationally known performer. At some time during each party, Mr. Moore would typically address the attendees—the overwhelming majority of whom were real estate agents who had sold at least two homes constructed by the Moores during the calendar year—to thank them for their efforts to sell houses his company had constructed during the last year and to encourage them to sell houses his company would construct in the coming year. (Order on Final Pre–Trial Conference at ¶ (1)(ss); R. at 169.) On their annual tax returns, the Moores made it their practice to deduct the costs associated with these annual parties as business-related entertainment expenses, pursuant to I.R.C. §§ 162 and 274. (Pls.' Post–Trial Br. at 13.)

The 1989 party took place in the grand ballroom of the Omni Waterside Hotel in Norfolk and featured a performance by singer Barbara Mandrell. (R. at 168.) The Moores claimed a business-related entertainment expense deduction of $347,000 for this party on their 1989 tax return, which deduction was carried back to their 1986 tax return. (R. at 246.) The gross sales of the Moores' business in 1989 was $57.9 million. (R. at 231, 246.) The Government opposes the deduction, contending that the party is really a nondeductible goodwill expense, as opposed to a business-related entertainment expense. (Def.'s Post–Trial Br. at 42.)

### D.

Beginning in July 1986, the Moores made a series of loans to a long-time acquaintance, Nancy Creech ("Creech"), in connection with real estate development projects in which the Moores and Creech shared partnership interests. (Order on Final Pre–Trial Conference at ¶ (1)(ww); R. at 135–38.) Although the majority of these loans were secured by deeds of trust on Creech's real property interests, $698,503 of the loans to Creech were unsecured. (Order on Final Pre–Trial Conference at ¶ (1)(yy); Def.'s Post–Trial Br. at 45.) Mr. Moore testified at trial that at the end of 1988, he expected Creech to repay the unsecured loans with proceeds from the Lakeridge residential development project, in which both Creech and the Moores held partnership interests. (R. at 138–39.) Sometime in the fall of 1989, however, NationsBank withdrew its financing of the Lakeridge project, foreclosed on the Lakeridge property, and obtained a deficiency judgment against the Lakeridge partners. (Order on Final Pre–Trial Conference at ¶ (1)(bbb); R. at 140–41, 186, 236.)

In their 1989 tax return, the Moores took a bad debt deduction, pursuant to I.R.C. § 166, for the amount of the unsecured loan to Creech. (Pls.' Post–Trial Br. at 18.) Because Creech's 1989 financial statement shows an $806,000 interest in the Lakeridge project and a net worth of $767,825, the Government contends that the Moores have failed to prove that some identifiable event occurred in 1989 which caused them to abandon any reasonable expectation of collecting the debt from Creech. (Pls.' Post–Trial Br. at 17; Def.'s Post–Trial Br. at 45.)

## II. DISCUSSION

The parties have agreed that the Court must resolve four discrete issues in this case: 1) whether the Moores are entitled to take a deduction for what they allege to have been an involuntary conversion loss in the 1989 tax year due to the fact that a significant percentage of the Boy Scout Tract became protected wetlands under the 1989 Manual and the 1989 Memorandum Agreement; 2) whether the Moores are entitled to a net operating loss deduction in the 1989 tax year arising from their treatment of eight (8) subdivisions as separate business undertakings and their corresponding characterization of losses from rental activity within those subdivisions as non-passive activity losses; 3) whether the Moores are entitled to an entertainment expense deduction for the 1989 tax year for an expensive party they hosted for real estate agents who sold at least two of their homes during that year; and 4) whether the Moores are entitled to a non-business bad debt deduction for the 1989 tax year for unsecured loans they had made to Creech. The Court will address these issues seriatim.

### A. Involuntary Conversion Loss/Regulatory Taking

The only issue raised in the complaint is whether the Moores are entitled to take a deduction for an involuntary conversion loss they allege was realized as a result of the stricter wetlands regulations which went into effect in 1989.

The Court will first summarize tax law regarding deductions for involuntary conversion losses. The Court will then identify salient principles of "takings" law, with an emphasis on the law of regulatory takings. Lastly, the Court will apply these principles to the present dispute.

#### 1.

Generally speaking, I.R.C. § 1231 allows capital gains treatment for certain transactions that would typically yield ordinary income and ordinary loss treatment for certain transactions that would typically yield capital losses. Specifically, § 1231(a) permits a taxpayer to characterize an involuntary conversion of property used in the taxpayer's trade or business as an ordinary loss as opposed to

3. I.R.C. § 1231(a) provides in pertinent part:

§ 1231. Property used in the trade or business and involuntary conversions.
   (a) General rule.—
   (1) Gains exceed losses.—If—
   (A) the section 1231 gains from any taxable year, exceed
   (B) the section 1231 losses for such taxable year, such gains and losses shall be treated as long-term capital gains or long-term capital losses, as the case may be.

   .   .   .   .   .

   (4) Special rules.—For purposes of this subsection—

   .   .   .   .   .

   (B) Losses (including losses not compensated for by insurance or otherwise) on the destruction, in whole or in part, theft or seizure, or requisition or condemnation of—
   (i) property used in the trade or business, or
   (ii) capital assets which are held for more than 1 year and are held in connection with a trade or business or a transaction entered into for profit, shall be treated as losses from a compulsory or involuntary conversion.
   (C) In the case of any involuntary conversion (subject to the provisions of this subsection but for this sentence) arising from fire, storm, shipwreck, or other casualty, or from theft, of any—

a capital loss. See I.R.C. § 1231(a);[3] see also Treas.Reg. § 1.1231–1(b). A loss from a condemnation of real estate used in trade or business is an involuntary conversion loss so as to trigger the special rule contained in § 1231(a). See Treas.Reg. § 1.1231–1(e).[4]

A taxpayer may deduct involuntary conversion losses within the meaning of § 1231 pursuant to I.R.C. § 165. As a general rule, § 165(a) permits a deduction of losses "sustained during the taxable year and not compensated for by insurance or otherwise." I.R.C. § 165(a). To be allowed as a deduction under § 165(a), a loss must be evidenced by a closed and completed transaction, fixed by an identifiable event and actually sustained. See Treas.Reg. § 1.165–1(b). In addition, because § 165(a) allows a deduction only for losses "not compensated for by insurance or otherwise," I.R.C. § 165(a), if an event results in a loss and

> there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, no portion of the loss with respect to which reimbursement may be received is sustained, for purposes of section 165, until it can be ascertained with

(i) property used in trade or business, or
(ii) any capital asset which is held for more than 1 year and is held in connection with a trade or business or a transaction entered into for profit, this subsection shall not apply to such conversion (whether resulting in gain or loss) if during the taxable year the recognized losses from such conversions exceed the recognized gains from such conversions.

4. Treas.Reg. § 1.1231–1(e) provides in pertinent part:

(e) Involuntary conversion—(1) General rule. For purposes of section 1231, the terms compulsory or involuntary conversion and involuntary conversion of property mean the conversion of property into money or other property as a result of complete or partial destruction, theft or seizure, or an exercise of the power of requisition or condemnation, or the threat or imminence thereof. Losses upon the complete or partial destruction, theft, seizure, requisition, or condemnation of property are treated as losses upon an involuntary conversion whether or not there is a conversion of the property into other property or money and whether or not the property is uninsured, partially insured, or totally insured.

reasonable certainty whether or not such reimbursement will be received. Treas.Reg. § 1.165–(d)(2)(i). Thus, in order to receive their claimed refund, the Moores must show that the loss which they claimed on their 1989 tax return relating to the Boy Scout Tract was: 1) evidenced by a closed and completed transaction; 2) fixed by an identifiable event; and 3) actually sustained in that there was no reasonable prospect of recovery of compensation for the loss.

### 2.

"Takings" law flows from the Fifth Amendment to the Constitution, which concludes: "... nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. The Just Compensation Clause "was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960). For almost 150 years after the writing of the Constitution, the Just Compensation Clause was implicated only when the government physically occupied private lands. *See, e.g., Loveladies Harbor, Inc. v. United States,* 28 F.3d 1171, 1175 (Fed.Cir. 1994). The emergence of the regulatory state in the early part of this century, however, gave rise to concerns about a new kind of taking, one in which the government's interference with private property rights was more indirect than an outright physical appropriation. *See, e.g., Hendler v. United States,* 952 F.2d 1364, 1371 (Fed.Cir.1991). In a passage which has come to be recognized as the birth of the law of regulatory takings, Justice Holmes captured the essence of this new concern when he noted: "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922).

For years after *Pennsylvania Coal,* courts in this country struggled to refine Justice Holmes' conception of when regulation of property went "too far." For fifty years, the Supreme Court essentially let state courts decide the issue. *See, e.g., Hendler,* 952 F.2d at 1372. In 1978, the Court recognized that it had been "unable to develop any 'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons. Indeed, [such determinations] depend[ ] largely 'upon the particular circumstances [of the] case.' " *Penn Central Transp. Co. v. New York,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978) (citations omitted). Nevertheless, in *Penn Central,* the Court identified three factors which have particular significance in the "essentially ad hoc, factual inquiries," *see id.,* required in regulatory takings cases: 1) the economic impact of the regulation on the claimant; 2) the extent to which the regulation interfered with distinct investment-backed expectations; and 3) the character of the governmental action. *See id.; accord Kaiser Aetna v. United States,* 444 U.S. 164, 175, 100 S.Ct. 383, 390–91, 62 L.Ed.2d 332 (1979); *PruneYard Shopping Center v. Robins,* 447 U.S. 74, 83, 100 S.Ct. 2035, 2041–42, 64 L.Ed.2d 741 (1980).

Courts with some expertise in takings claims[5] have further refined the factors enumerated in *Penn Central.* The Court of Appeals for the Federal Circuit explains that the economic impact factor "was intended to ensure that not every restraint imposed by government to adjust the competing demands of private owners would result in a takings claim." *Loveladies Harbor,* 28 F.3d at 1176–77 (quoting *Pennsylvania Coal,* 260 U.S. at 413, 43 S.Ct. at 159 ("Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law.")). Therefore, to satisfy the first requirement of a regulatory taking, a claimant must show serious financial loss, in the form of a denial of economically viable

---

5. Because the Court of Federal Claims is the primary forum for the determination of takings claims, *see* Linda A. Malone, Environmental Regulation of Land Use, § 404[1], at 4–33 n. 24.1 (Supp.1995), that court and the Court of Appeals for the Federal Circuit possess some expertise in the area of takings law.

use of land. *See Loveladies Harbor,* 28 F.3d at 1177. In addition, the interference with investment-backed expectations factor "was a way of limiting takings recoveries to owners who could demonstrate that they bought their property in reliance on a state of affairs that did not include the challenged regulatory regime." *See id.* (citing, *inter alia, Ciampitti v. United States,* 22 Cl.Ct. 310, 321–22 (1991) (landowner who purchased wetlands with knowledge of regulatory regime and with warning that requisite permit was "virtually impossible to get" had no reasonable investment-backed expectations)). Lastly, the character of governmental action assessment required a court to balance private property interests against the public interest in the regulation of property to promote the general welfare. *See id.* at 1176. In the words of the Federal Circuit, "[t]his included considering not only the avowed need of the Government—the interest of the public being protected—but also whether the method of attaining the sought-after goal was reasonably designed to attain it." *Id.* (citations omitted).

A 1992 Supreme Court case altered the *Penn Central* analysis in a significant way. In *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), the petitioner (Lucas) had purchased two (2) beachfront lots on the Isle of Palms in South Carolina on which he intended to build two (2) single-family homes. Subsequent to his purchase of the land but before the construction of the homes, the South Carolina Legislature enacted a measure, designed to protect the fragile beachfront environment, which effectively barred the construction of permanent habitable structures on Lucas' land. *See id.* at 1006–07, 112 S.Ct. at 2889. There was little doubt that the first two *Penn Central* factors—namely, that Lucas had been denied economically viable use of his land and that the new regulations had interfered with his distinct investment-backed expectations—weighed in favor of finding that a taking had occurred. *See Loveladies Harbor,* 28 F.3d at 1178. The real issue in the case, then, concerned the character of the governmental action, specifically, whether the costs of implementing regulations designed to further the public

interest in preserving the beachfront should be borne by the public or by Lucas disproportionately. The Court found that the new legislation amounted to a taking of Lucas' property without just compensation if it deprived him of one of the bundle of rights which he owned under state property law when he purchased the beachfront lots. *See Lucas,* 505 U.S. at 1020–32, 112 S.Ct. at 2896, 2902. Because Lucas owned a fee simple interest in the lots, the only restraint on Lucas' interest was the power of the state to abate nuisances. *See id.* Although the Supreme Court was not inclined to find that Lucas' intended use of the beachfront lots was precluded by South Carolina nuisance law, it recognized that the ultimate determination of that issue was a matter for the courts of that state to decide. *See id.* at 1031, 112 S.Ct. at 2901–02. Accordingly, the Court remanded the case to the South Carolina Supreme Court, which determined that Lucas' intended use of the property could not have been restrained under common law nuisance principles in that jurisdiction. *See Lucas v. South Carolina Coastal Council,* 309 S.C. 424, 424 S.E.2d 484, 486 (1992). The Federal Circuit summarized *Lucas'* effect on regulatory takings cases as follows:

> The effect, then, of *Lucas* was to dramatically change the third criterion [i.e. the character of the governmental action], from one in which courts, including federal courts, were called upon to make ad hoc balancing decisions, balancing private property rights against state regulatory policy, to one in which state property law, incorporating common law nuisance doctrine, controls.

*Loveladies Harbor,* 28 F.3d at 1179. It is with this relatively recent modification in the law of regulatory takings that this Court must consider the present issue.

3.

■ Although it is a tax case, the resolution of the present controversy revolves around the regulatory takings issue. The Moores argue that the identifiable event which gave rise to their claimed involuntary conversion was the enactment of the 1989 Manual and the 1989 Memorandum Agree-

ment, which effected a regulatory taking of the Boy Scout Tract because it led to a ninety-seven percent (97%) diminution in the value of that tract. (*See* Pls.' Post–Trial Brief at 23–24.) In addition, the Moores argue that there was no reasonable prospect of recovery for their loss because a denial of a § 404 permit is a prerequisite to an inverse condemnation suit in the Court of Federal Claims and their environmental consultants advised them that the Corps had a practice of never formally denying § 404 permits with wetland impacts on the order of magnitude involved in the proposed development of the Boy Scout Tract. (*See id.* at 26.) The Government contends that the Moores' claimed loss was not evidenced by an identifiable event, as required by the governing Treasury Regulations. The Government makes three arguments to support its position. First, the Government maintains that the Moores' claim is premature because they failed to complete the § 404 permit process so as to establish a regulatory taking of the Boy Scout Tract. Second, the Government argues that the Moores failed to show that the stricter wetlands regulations effectively denied the Boy Scout Tract of *all* of its economically viable use. Lastly, the Government maintains that the Moores failed to show that the § 404 permit process was so draconian that it precluded any reasonable prospect of recovery relating to the Boy Scout Tract.

█ As a threshold matter, the Court must determine whether the Moores' claim is premature because they were never formally denied a § 404 permit. The Supreme Court addressed that issue in *United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985). In that case, the Corps filed suit in a district court in Michigan to enjoin a landowner from filling wetlands near the shores of a lake without a permit issued from the Corps' pursuant to its jurisdiction over wetlands. The landowner took issue with the Corps' classification of the property as jurisdictional wetlands because the land was not subject to flooding from adjacent navigable waters. Noting its concern that a broad construction of the term "wetlands" might result in takings problems, the Sixth Circuit Court of Appeals endorsed the landowner's narrow definition of that

term. *See id.* at 124–25, 106 S.Ct. at 457–58. The Supreme Court found that the language, policies and history of the Clean Water Act compelled a finding that the Corps' interpretation of the Act was reasonable. *See id.* at 139, 106 S.Ct. at 465. Significantly, the Court discounted the lower court's concern over potential takings of property through the application of the permit process:

> [W]e have made it quite clear that the mere assertion of regulatory jurisdiction by a governmental body does not constitute a regulatory taking. The reasons are obvious. A requirement that a person obtain a permit before engaging in a certain use of his or her property does not itself "take" the property in any sense: after all, the very existence of a permit system implies that permission may be granted, leaving the landowner free to use the property as desired. Moreover, even if the permit is denied, there may be other viable uses available to the owner. *Only when a permit is denied and the effect of that denial is to prevent "economically viable" use of the land in question can it be said that a taking has occurred.*

*See id.* at 126–27, 106 S.Ct. at 459 (citations omitted) (emphasis added). This statement is in keeping with the general proposition that a plaintiff is not entitled to seek judicial review before following prescribed administrative remedies. *See, e.g., Hodel v. Virginia Surface Mining & Reclamation Ass'n,* 452 U.S. 264, 297, 101 S.Ct. 2352, 2371, 69 L.Ed.2d 1 (1981).

Although this language from the Supreme Court would ordinarily defeat the Moores' regulatory taking claim on ripeness grounds, some evidence adduced at trial militates against a strict application of the general rule in this case. The Moores had three experts testify as to the prospects that a § 404 permit for the proposed development of the Boy Scout Tract would have been either issued or finally denied under the regime established by the 1989 Manual and 1989 Memorandum Agreement. The most compelling testimony came from Bernard Goode ("Goode"), an engineer employed by the Corps for thirty-four (34) years until he retired in 1989 to begin his own environmental consulting practice.

(*See* R. at 191–92.)[6] When asked for his opinion concerning the likelihood that a § 404 permit would be issued for the Boy Scout Tract, Goode testified: "It is my opinion that there was a very low likelihood that this project would have been approved." (*Id.* at 205.) When asked about the likelihood that a § 404 permit for the Boy Scout Tract would have been formally denied, Goode testified:

It has been my experience in studying this very issue nationwide that there was a very low likelihood that the Corps would have denied the application. Because the Corps can't reach that point until they have gone through the full analysis, which includes the mitigation sequencing.

And it is a much more likely outcome that more and more information is requested until eventually the applicant loses staying power and either withdraws the application himself, or the Corps says because of the lack of information to continue the valuation, the Corps withdraws the application.

And that is the outcome of well over half of the 404 applications.

Here in the Norfolk district I looked at some statistics and there is [sic] over 3/4 of the cases end up being withdrawn for section 404 permit applications. Only one percent end up being denied.

(*See id.* at 206.) Goode's testimony on this latter point was corroborated by the Moores' other two expert witnesses. Robert Kerr ("Kerr"), an environmental consultant with experience in over sixty (60) § 404 permit applications, testified:

We advised the [Moores] that there was no chance of getting a permit.

.     .     .     .     .

We also told Mr. Moore [the Corps] would never reject the permit.

.     .     .     .     .

Because rejecting a permit could set a precedent also. And as the government's attorney stated, you have to have a permit denial to go for a taking.

Well, the Corps knows that and will not issue a denial, an open denial. They will just request additional information, and more additional information, and the more you give them the more they ask for. . . . They basically bleed a client to death financially until you have spent so much money on the alternatives analysis you've drained the profitability out of the project.

(*See id.* at 52–53.) Doug Davis ("Davis"), an environmental consultant who at one time worked in the Corps' wetlands program, testified that the likelihood of a permit being issued for the Boy Scout Tract was "as close to zero as it can get," (*see id.* at 90), and that a permit would not have been finally denied because projects like that contemplated for the Boy Scout Tract "just sort of wither on the vine and no final agency action is taken." (*See id.* at 91.) In addition, both Kerr and Davis testified that completing the § 404 permit process in this case would have been a very lengthy and expensive proposition, costing hundreds of thousands of dollars. (*See id.* at 48–53, 87–88.)

In presenting the testimony of their expert witnesses, the Moores essentially beseech the Court to excuse their failure to complete the § 404 permit process because they were advised that resort to that process would be futile. Some lower federal courts have recognized a narrow "futility exception" to the general rule requiring the exhaustion of administrative remedies before pursuit of judi-

---

**6.** During his career at the Corps, Goode held senior administrative and policy positions, including Chief of the Regulatory Branch for the Jacksonville District, Chief of the Regulation and Policy Section, and ultimately, nationwide Chief of the Regulatory Program. (*See* R. at 192–93.) In this last position, Goode was responsible for the regulations, the policies, and the implementation of the Corps' three principal regulatory programs in the thirty-seven (37) district and eleven (11) division offices nationwide. (*See id.*) As nationwide Chief of the Regulatory Program,

Goode was involved in the creation of the 1987 Manual; he was also appointed the Corps' policy representative for meetings with the EPA which resulted in the 1989 Memorandum Agreement, which agreement established the mitigation sequencing guidelines at issue in this case. (*See id.* at 194–97.) In the last six years, Goode has testified regarding the effect of the Memorandum Agreement before a White House task force on wetlands, the House Merchant Marine Committee, and two (2) subcommittees each from both the House and the Senate. (*See id.* at 199–200.)

cial review. *See, e.g., Gilbert v. City of Cambridge,* 932 F.2d 51, 60–61 (1st Cir.1991) ("[T]here are circumstances in which a party, on grounds of futility, might bypass a permit process and go directly to court seeking judicial review of a law's constitutionality under the Takings Clause."); *see also* Daniel R. Mandelker, et al., Federal Land Use Law § 4A.02[4][c] (1990 & Supp.1996). The Ninth Circuit Court of Appeals has most thoroughly developed this narrow exception. That court has decided that for the futility exception to apply, a party must have made at least one meaningful application for a permit within the challenged regulatory scheme. *See Kinzli v. City of Santa Cruz,* 818 F.2d 1449, 1454–55, *amended,* 830 F.2d 968 (9th Cir.1987), *cert. denied,* 484 U.S. 1043, 108 S.Ct. 775, 98 L.Ed.2d 861 (1988); *see also Southern Pacific Transp. Co. v. City of Los Angeles,* 922 F.2d 498, 503 (9th Cir.1990), *cert. denied,* 502 U.S. 943, 112 S.Ct. 382, 116 L.Ed.2d 333 (1991). The First Circuit Court of Appeals has stated: "To come within the exception, a sort of inevitability is required: the prospect of refusal must be certain (or nearly so)." *Gilbert,* 932 F.2d at 61. Futility may also exist if there is unreasonable, extraordinary, excessive, or considerable delay. *See, e.g., Tabb Lakes Ltd. v. United States,* 10 F.3d 796 (Fed.Cir.1993); *Tahoe–Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency,* 911 F.2d 1331, 1338 n. 5 (9th Cir.1990), *cert. denied,* 499 U.S. 943, 111 S.Ct. 1404, 113 L.Ed.2d 459 (1991); *Landmark Land Co. v. Buchanan,* 874 F.2d 717, 721 (10th Cir.1989); *Kinzli,* 818 F.2d at 1454 n. 5.

This Court places considerable credence in the testimony of the Moores' expert witnesses, particularly Mr. Goode, whose record of public service suggests that he is not the kind of man who would prostitute himself for the sake of a paying client's case by testifying that the 1989 wetland regulations were "out of hand" when in fact they were fulfilling their objectives. Therefore, it is not difficult for the Court to sympathize with the Moores' position in this case. A landowner should not be required to drain the profitability of a project only to be kept "on ice indefinitely." *Tahoe–Sierra Preservation Council,* 911 F.2d at 1338 n. 5. Indeed, a regulatory program which puts a landowner to the Hobson's choice of spending good money after bad in the remote hope of obtaining final administrative action or losing the right to assert a claim guaranteed by the Fifth Amendment may well be a regulatory program gone far afield.

Nevertheless, the Court cannot agree that the futility exception applies under the facts and circumstances of the present case. The Moores certainly did not complete one meaningful § 404 application. In fact, the record indicates that the Moores failed to respond to the Corps' first request for information to supplement their initial permit application. (*See* Pls.' Exh. # 3.) This fact distinguishes the present matter from cases in which the Court of Federal Claims has applied the futility exception in the wetlands context. *See Marks v. United States,* 34 Fed.Cl. 387, 405 (1995); *City National Bank of Miami v. United States,* 30 Fed.Cl. 715, 720 (1994) (landowner's regulatory taking claim not premature despite failure to obtain required state certificates because correspondences made it clear that the Corps' denial of § 404 permit was based on the preservation of wetlands, not on a failure to obtain required state certificates); *Florida Rock Industries, Inc. v. United States,* 21 Cl.Ct. 161, 170 (1990) (no need for landowner to seek required state permits when it was evident that Corps' denial of § 404 permit was final). Moreover, considering the case law which has addressed the validity of the § 404 permit process, the Court cannot agree that the permit process would have resulted in an unreasonable, extraordinary, excessive or considerable delay, or that a permit refusal was inevitable. To this Court's knowledge, no federal court has ever so much as intonated that the § 404 permit process was so flawed that its mere enactment could rise to the level of a taking. Indeed, in *Riverside,* the Supreme Court itself gave its imprimatur to the § 404 permit process. *See Riverside Bayview Homes,* 474 U.S. at 127, 106 S.Ct. at 459 ("[T]he very existence of a permit system implies that permission may be granted, leaving the landowner free to use the property as desired."). Federal courts at all other levels, relying on *Riverside,* have implicitly

recognized the validity of the § 404 permit system. *See, e.g., Tabb Lakes, Ltd. v. United States,* 10 F.3d 796, 801 (Fed.Cir.1993) ("As a matter of law, the possibility of a permit precludes the order [to cease and desist from filling wetlands without a permit] itself from constituting a taking. Plaintiff was not precluded from development; it was precluded from development without a permit.") (citation omitted); *United States v. Rivera Torres,* 826 F.2d 151, 157 (1st Cir.1987) ("The designation of appellant's property as 'wetland' is not the end of the road. Appellant could have requested a permit to engage in the actions allegedly taken by him."); *Conant v. United States,* 12 Cl.Ct. 689, 692 (1987) ("The existence of an administrative procedure presupposes that a claimant may be able to achieve a resolution of his claim without need to resort to judicial review."); *see also, e.g., Dufau v. United States,* 22 Cl.Ct. 156, 162 (1990) (in wetlands context, "Plaintiffs cannot meet the threshold requirement for a permanent regulatory taking claim because they have not been denied a permit."); *Ciampetti v. United States,* 18 Cl.Ct. 548, 553 n. 10 (1989) (noting in a wetlands case that a takings claim is not ripe for judicial review if plaintiff has not exhausted all available administrative remedies); *United States v. Tull,* 615 F.Supp. 610 (E.D.Va.1983) (Doumar, J.) (failure of developer to exhaust administrative remedies by applying for wetlands development permit rendered his takings claim untimely); William L. Want, Law of Wetlands Regulation § 9.02 (1990 & Supp.1995) ("Courts usually dismiss suits by landowners as not ripe if the Corps has not begun or completed the process of making a wetlands determination or a permit decision."); Linda A. Malone, Environmental Regulation and Land Use § 4.04[1] n. 2, at 4–30 (1990 & Supp.1995); *cf. United States v. Sasser,* 967 F.2d 993, 998 (4th Cir.1992) (citing *Riverside* ). In light of this extensive line of authority, this Court is reluctant to conclude that the outcome of the Moores' § 404 permit application was inevitable or would have come only after excessive delay so as to trigger the futility exception. The Court is especially reluctant to apply the futility exception in light of the fact that "Government officials are presumed to carry out their duties in good faith, and it takes 'well-nigh irrefragable proof' to overcome this presumption." *Dufau,* 22. Cl.Ct. at 164 (citation omitted); *see also Gilbert,* 932 F.2d at 61 ("Since obtaining a final [agency] decision should be the rule, ... the burden of establishing futility must lie with the party seeking to bypass the permit procedure—and any reasonable doubt ought to be resolved against that party."). Therefore, the Court FINDS that the futility exception does not excuse the Moores from failing to pursue a § 404 permit before pursuing their regulatory taking claim.

There may exist a set of facts and circumstances under which a court could declare, in good conscience, that the 1989 wetlands regulations were so "out of hand" that their mere enactment rose to the level of a regulatory taking. However, the facts and circumstances of the matter *sub judice* do not present such a case. The Moores purchased the Boy Scout Tract in October 1988. The 1989 Manual went into effect in March of 1989, and the 1989 Memorandum Agreement went into effect in November of that year. The Moores did not file an application for a § 404 permit regarding the Boy Scout Tract until January 28, 1991. Allowing the Moores to claim a deduction for an alleged taking of the Boy Scout Tract in 1989 when their first permit application was filed thirteen (13) months after the close of the 1989 tax year does not sit well with this Court. The timing of the claimed deduction appears to the Court to be a contrived attempt to maximize losses in what was a bad year for the Moores in order to carry those losses back to offset income from preceding years, such as 1986, in which the Moores enjoyed considerable financial success.

Moreover, even if the facts and circumstances of this case were more favorable to the Moores, this Court would not be the forum for as drastic and far-reaching a pronouncement as that which they seek in this lawsuit. Given the Supreme Court's implicit approval of the § 404 permit process in *Riverside,* and the considerable line of authority from federal courts at all levels stemming from that case, a determination that the 1989 wetlands regulations went "too far" and con-

sequently rose to the level of a Fifth Amendment taking would necessarily emanate from a higher authority than is possessed by this Court.

The Court FINDS that the Moores' failure to adequately pursue a § 404 permit bars their regulatory taking claim, and that the involuntary conversion loss deduction they claimed on their 1989 tax return was improper. Accordingly, the Moore's claim for a refund is DENIED.

### B. Passive Activity Loss

■ The first issue raised by the Government in its counterclaim is the Moores' treatment of receipts from the rental of homes in eight (8) of their subdivisions as non-passive activity losses. The Government maintains that the Moores have attempted to avoid the statutory limitation on the use of passive activity losses by artificially characterizing each of the eight (8) subdivisions as a single undertaking for tax purposes, as opposed to characterizing each home within the disputed subdivisions as a separate undertaking. Such characterization, the Government contends, enabled the Moores to utilize the losses from the rental of homes in a particular subdivision (typically passive activity) to offset profits from the sale of homes in the same subdivision (typically non-passive activity), in contravention of I.R.C. § 469. The Moores answer that their characterization of each subdivision as a separate undertaking was consistent with the Temporary Treasury Regulations interpreting I.R.C. § 469 and was not contrived to lessen their tax liability.

As a general matter, I.R.C. § 469 provides that passive activity losses in excess of passive activity income are not deductible against non-passive activity income. *See* I.R.C. § 469(a); *see also Wiseman v. Commissioner,* No. 24183–93, 1995 WL 273967, at *2 (U.S. Tax Ct. May 10, 1995). Thus, the characterization and aggregation of business and rental operations into passive and non-passive activities has important tax consequences. As a general rule, rental activity is considered passive activity. *See* I.R.C. § 469(c)(2); *see also Wiseman,* 1995 WL 273967, at *2.

Temporary Treasury Regulation § 1.469–4T governs the characterization and aggregation of activities for tax years ending before 1992. *See* Jacob Mertens, Jr., Mertens Law of Federal Income Taxation § 24C.08.50 (1994 & Supp.1996). As a general matter, § 1.469–4T contains three groups of rules: rules that identify the business and rental operations that constitute an undertaking (the undertaking rules); rules that identify the undertaking or undertakings that constitute an activity (the activity rules); and special rules applicable in limited circumstances. *See* Temp.Treas.Reg. § 1.469–4T(a)(2) (May 12, 1989).

For tax purposes, an undertaking is the smallest unit which can constitute an activity. *See* § 1.469–4T(a)(3). An undertaking may, nonetheless, include diverse business and rental operations. *See id.* Generally speaking, an undertaking is comprised of business and rental operations that constitute a separate source of income production. *See* § 1.469–4T(c)(1).[7] The basic undertaking rule provides that business and rental operations constitute a separate source of income production if and only if they are owned by the same person and are conducted at a common location which produces income for the owner. *See* § 1.469–4T(c)(2).[8] Business and rental operations are conducted at the same location if they are in the same physical structure or within close proximity to one another. *See* § 1.469–4T(c)(2)(iii)(B).[9] In-

---

**7.** Section 1.469–4T(c)(1) provides in pertinent part: *"In general* .... [B]usiness and rental operations that constitute a separate source of income production shall be treated as a single undertaking that is separate from other undertakings."

**8.** Section 1.469–4T(c)(2)(i) provides in pertinent part:

(i) *In general.* .... [B]usiness and rental operations shall be treated for purposes of this para-

graph (c) as a separate source of income production if and only if—

(A) Such operations are conducted at the same location ... and are owned by the same person ...; and

(B) Income-producing operations ... owned by such person are conducted at such location.

**9.** Section 1.469–4T(c)(2)(iii) provides in pertinent part:

come producing operations include the production of property at a specified location, the sale of property at a specified location, the performance of services for customers at a specified location, and the taking of physical possession of property that is made available for the use of customers at a specified location. *See* § 1.469–4T(c)(2)(iv).[10]

Rental undertakings are subject to a special rule. Typically, rental and non-rental undertakings are considered separate undertakings for tax purposes, as opposed to being aggregated into a single undertaking. *See* § 1.469–4T(d)(1)(i).[11] However, rental and non-rental undertakings can be aggregated into a single undertaking so long as either the rental undertaking or the non-rental undertaking accounts for more than eighty percent (80%) of the gross income from the two endeavors combined. *See* § 1.469–4T(d)(2).[12]

The basic activity rule provides that "each undertaking in which a taxpayer owns an interest shall be treated as a separate activity of the taxpayer." § 1.469–4T(b)(1).

For 1989 tax purposes, the Moores treated each of the eight (8) subdivisions in which rental receipts were less than twenty percent (20%) of total receipts from rentals and sales combined as a single undertaking and, therefore, a single activity. Because the sale of homes predominated in these eight subdivisions, the Moores were able to characterize each subdivision as a single non-passive activity. This characterization enabled the Moores to offset some of their profits from the sale of homes in each subdivision with the losses they incurred from renting homes in those same subdivisions. The Government contends that the Moores' treatment of these eight (8) subdivisions was an attempt to reduce their tax liability by circumventing the effect of § 469. The Government argues that each home within each subdivision should be treated as a separate undertaking for tax purposes.

The stipulated facts of this case indicate that the sale and rental of homes within the eight (8) subdivisions comprises a single undertaking, and therefore, a single non-passive activity. First, the Government does not dispute that the sales and rental operations at issue in this case were conducted by the same owner (i.e. the taxpayers, filing jointly) so as to satisfy the same owner component of the basic undertaking rule. *See* § 1.469–4T(c)(2)(i)(A). Second, the parties stipulated that all income-producing operations in the subdivisions occurred in the same physical location and in close proximity to each other. (*See* Order on Final Pre–Trial Conference at ¶ (1)(11) and (mm).) Thus, each subdivision satisfied the same location component of the basic undertaking rule. *See* § 1.469–4T(c)(2)(i)(A). The Government's suggestion that the performance of certain support operations at the Moores' management office precludes compliance with the same location component of the basic undertaking rule is not persuasive. *See*

(iii) *Location.* For purposes of this paragraph (c)(2)—
(A) The term "location" means, with respect to any business and rental operations, at a fixed place of business at which such operations are regularly conducted;
(B) Business and rental operations are conducted at the same location if they are conducted in the same physical structure or within close proximity of one another;

(C) The performance of services for customers at such location;
(D) Transactions in which customers take physical possession at such location of property that is made available for their use; or
(E) Any other transactions that involve the presence of customers at such location.

10. Section 1.469–4T(c)(2)(iv) provides in pertinent part:
*Income-producing operations.* For purposes of this paragraph (c)(2), the term "income-producing operations" means business and rental operations that are conducted at a location and relate to . . .—
(A) The production of property at such location;
(B) The sale of property to customers at such location;

11. Section 1.469–4T(d)(1)(i) provides in pertinent part: "(i) A paragraph (c) undertaking's rental operations and its operations other than rental operations shall be treated . . . as two separate undertakings."

12. Section 1.469–4T(d)(2) provides in pertinent part: "*Exceptions.* Paragraph (d)(1)(i) of this section shall not apply to a paragraph (c) undertaking for any taxable year in which— . . . (ii) Less than 20 percent of the gross income of the paragraph (c) undertaking is attributable to rental operations; . . ."

§ 1.469–4T(c) Example (8). Third, the parties stipulated that income-producing operations occurred at the subdivisions. (*See* Order on Final Pre–Trial Conference at ¶ (1)(hh)–(kk).) Thus, each subdivision satisfied all three components of the basic undertaking rule. *See* § 1.469–4T(c)(2)(i). The special undertaking rule regarding rental operations—i.e. that rental and non-rental operations generally cannot be aggregated into a single undertaking—does not require a different result because the exception to that rule applies in this case, in that in each of the eight (8) subdivisions at issue receipts from sales of homes accounted for more than eighty percent (80%) of total receipts from sales and rentals combined. *See* § 1.469–4T(d)(1) and (2). Thus, the sales and rental operations within each of the eight (8) subdivisions could have been properly treated as a single undertaking.

Pursuant to the basic activity rule, each of the eight (8) subdivisions in this case also constitutes a separate activity. *See* § 1.469–4T(b)(1). Moreover, because receipts within each subdivision were predominantly attributable to sales rather than rentals, the activities within each subdivision were properly characterized as non-passive. Accordingly, the Court FINDS that the Moores properly treated each of the eight (8) subdivisions at issue as a single non-passive undertaking/activity on their 1989 tax return and DENIES the first count of the Government's counterclaim.

**13.** I.R.C. § 162(a) provides in pertinent part: "There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business...."

**14.** I.R.C. § 274(a)(1) provides in pertinent part:
(1) **In general.**—No deduction otherwise allowable under this chapter shall be allowed for any item—
(A) **Activity.**—With respect to an activity which is of a type generally considered to constitute entertainment ..., unless the taxpayer establishes that the item was directly related to, or, in the case of an item directly preceding or following a substantial and bona fide business discussion ..., that such item was associated with, the active conduct of the taxpayer's trade or business....

## C. *Entertainment Expense Deduction*

The second issue raised by the Government in the counterclaim is the entertainment expense deduction claimed by the Moores for the party at the Omni Waterside Motel in 1989. Although the Government did not contest the deductibility of the annual party in prior tax years, it now claims that the 1989 party constituted non-deductible goodwill expense because it was not directly related to the Moores' trade or business, as required by I.R.C. § 274(a)(1) and Treasury Regulation § 1.274–2. The Moores maintain that the party expenses were directly related to their business because the entertainment took place in a "clear business setting," as that term is defined in Treasury Regulation § 1.274–2(c)(4).

Generally, business expenses are deductible if they are shown to be "ordinary and necessary." *See* I.R.C. § 162.[13] Business entertainment expenses are deductible, however, only if they are shown to be "ordinary and necessary" *and* they are shown to be either "directly related to" the active conduct of the taxpayer's trade or business, or, in the case of entertainment directly preceding or following a substantial and bona fide business discussion, "associated with" the active conduct of a taxpayer's trade or business. *See* I.R.C. § 274(a)(1)(A);[14] Treas.Reg. § 1.274–2(a)(1).[15] The Moores do not contend that the party presently at issue directly preceded or followed a substantial and bona fide business discussion so as to qualify for the less exacting "associated with" standard. (*See* Pls.' Post–Trial Br. at 41.) Therefore, the

**15.** Treas.Reg. § 1.274–2(a)(1) provides in pertinent part:
(a) *General rules*—(1) *Entertainment activity.* Except as provided in this section, no deduction otherwise allowable under Chapter 1 of the Code shall be allowed for any expenditure with respect to entertainment unless the taxpayer establishes:
(i) That the expenditure was directly related to the active conduct of the taxpayer's trade or business, or
(ii) In the case of an expenditure directly preceding or following a substantial and bona fide business discussion ..., that the expenditure was associated with the active conduct of the taxpayer's trade or business.

Court need only decide whether the 1989 party was "directly related" to the active conduct of the Moores' business.

A business entertainment expense qualifies as "directly related"—and therefore deductible—if an active business discussion occurred during the entertainment activity or if the entertainment activity took place in a clear business setting. *See* Treas.Reg. § 1.274–2(c)(3) and (4); *see also* Jacob Mertens, Jr., Merten's Law of Federal Income Taxation §. 25D.32 (1994 & Supp.1996). The Moores do not contend that an active business discussion took place during the 1989 party. (*See* Pls.' Post–Trial Br. at 41.) The Court will address, therefore, only whether the 1989 party qualifies as a clear business setting.

A taxpayer can show that entertainment occurred in a clear business setting by "clearly establish[ing] that any recipient of the entertainment would have reasonably known that the taxpayer had no significant motive, in incurring the expenditure, other than directly furthering his trade or busi-

ness." Treas.Reg. § 1.274–2(c)(4).[16] Generally speaking, however, entertainment will not be considered to have occurred in a clear business setting if the entertainment is marked by substantial distractions, e.g., a meeting or discussion at a night club or during essentially social gatherings such as cocktail parties, or a meeting or discussion including persons other than the taxpayer's business associates at places such as cocktail lounges. *See* § Treas.Reg. 1.274–2(c)(4) and (7).[17] Nonetheless, some entertainment which is accompanied by substantial distractions—such as the entertainment of business and civic leaders at the opening of a new hotel or theatrical production where the taxpayer's obvious intention is to obtain business publicity as opposed to maintaining goodwill—may be considered to have occurred in a clear business setting if there was no meaningful personal or social relationship between the taxpayer and the recipients of the entertainment. *See* § Treas.Reg. 1.274–2(c)(4).[18]

16. Treas.Reg. § 1.274–2(c)(4) provides in pertinent part:

(4) *Expenditures in clear business setting.* An expenditure for entertainment shall be considered directly related to the active conduct of the taxpayer's trade or business if it is established that the expenditure was for entertainment occurring in a clear business setting directly in furtherance of the taxpayer's trade or business. Generally, entertainment shall not be considered to have occurred in a clear business setting unless the taxpayer clearly establishes that any recipient of the entertainment would have reasonably known that the taxpayer had no significant motive, in incurring the expenditure, other than directly furthering his trade or business. Objective rather than subjective standards will be determinative.

17. Treas.Reg. § 1.274–2(c)(4) also provides:

[E]ntertainment which occurred under any circumstances described in subparagraph (7)(ii) of this paragraph ordinarily will not be considered as occurring in a clear business setting. Such entertainment will generally be considered to be socially rather than commercially motivated.

In addition, Treas.Reg. § 1.274–2(c)(7) provides:

(7) *Expenditures generally considered not directly related.* Expenditures for entertainment, even if connected with the taxpayer's trade or business, will generally be considered not directly related to the active conduct of the taxpayer's trade or business, if the entertainment

occurred under circumstances where there was little or no possibility of engaging in the active conduct of trade or business. The following circumstances will generally be considered circumstances where there was little or no possibility of engaging in the active conduct of trade or business:

(i) The taxpayer was not present;

(ii) The distractions were substantial, such as:

(a) A meeting or discussion at night clubs, theaters, and sporting events, or during essentially social gatherings such as cocktail parties, or

(b) A meeting or discussion, if the taxpayer meets with a group which includes persons other than business associates, at places such as cocktail lounges, country clubs, golf and athletic clubs, or at vacation resorts.

An expenditure for entertainment in any such case is considered not to be directly related to the active conduct of the taxpayer's trade or business unless the taxpayer clearly establishes to the contrary.

18. Treas.Reg. 1.274–2(c)(4) continues as follows:

Expenditures made for the furtherance of a taxpayer's trade or business in providing a "hospitality room" at a convention ... at which goodwill is created through display or discussion of the taxpayer's products, will, however, be treated as directly related. In addition, entertainment of a clear business nature which occurred under circumstances

The Fourth Circuit Court of Appeals addressed the deductibility of business entertainment expenses in *Berkley Machine Works & Foundry Co. v. Commissioner,* 623 F.2d 898 (4th Cir.), *cert. denied,* 449 U.S. 919, 101 S.Ct. 317, 66 L.Ed.2d 147 (1980). In that case, a Norfolk-based machine shop claimed a deduction of some $100,000 for business entertainment expenses incurred in connection with a hunting and fishing facility it maintained on Ocracoke Island, North Carolina for the purpose of entertaining customers and their families on weekends. *Berkley,* 623 F.2d at 900. Although business was invariably discussed during weekend trips to the hunting and fishing facility, the court found that the expense of maintaining the facility was not directly related to the company's active conduct of its business—and therefore not deductible—because no weekends were arranged with anything more than a general expectation of deriving some business benefit, other than the general business goodwill which Congress intended to eliminate as a deduction by means of the directly related test, at some indefinite future time. *Id.* at 903–04 (citing *Handelman v. Commissioner,* 509 F.2d 1067, 1074 (2d Cir.1975); *Hippodrome Oldsmobile, Inc. v. United States,* 474 F.2d 959, 960 (6th Cir.1973); *St. Petersburg Bank & Trust Co. v. United States,* 362 F.Supp. 674 (M.D.Fla.1973), *aff'd,* 503 F.2d 1402 (5th Cir.1974)). In a footnote, the court held that the Ocracoke expenditures were not incurred in a clear business setting so as to be deductible under Treasury Regulation § 1.274–2(c)(4) because they were not "clearly subordinate to a business purpose" inasmuch as they were associated with a fairly large group of people, some of whom were not business associates, and took place in a setting with substantial distractions. *Id.* at 905 n. 8 (citing *D.A. Foster Trenching Co. v. United States,* 473 F.2d 1398, 1402–04 (Ct.Cl.1973)).

The Moores aver that the 1989 party occurred in a clear business setting because the attendees all knew that the only reason the Moores incurred the expense of the party was to promote the sale of their homes. The Government, on the other hand, maintains that the 1989 party did not occur in a clear business setting because distractions during the party were substantial. The Court agrees with the Moores that the expense of the 1989 party was incurred in a clear business setting, as that phrase has been defined in the Treasury Regulations and interpreted in the case law from this circuit.

The Moores have satisfied the requirements of the Treasury Regulations regarding business entertainment expenses incurred in a clear business setting in either of two ways. First, they have established that any attendee at the 1989 party would have reasonably known that the expense of the party was incurred only to further the Moores' business. *See* Treas.Reg. § 1.274–2(4). At trial, two real estate agents who attended the Moores' 1989 party, Janice Walz and Janice Haworth, testified that from their perspective, the Moores' sole motivation in hosting the annual party was to promote the sale of their homes. (*See* R. at 167, 174.) It is true that these subjective perceptions are not determinative of whether business entertainment expenses were incurred in a clear business setting. *See* Treas.Reg. § 1.274–2(c)(4) and (7)(ii); *see also Foster Trenching,* 473 F.2d at 1403–04. Nevertheless, the Government failed to give the Court any reason to believe that the perceptions of these two veteran professionals was anything other than reasonable. Indeed, Ms. Haworth's uncontroverted testimony was that all of the real estate agents who attended the 1989 party concurred with her and Ms. Walz in their belief that the sole purpose of the party was to promote the sale of homes constructed by the Moores. (*See* R. at 173.) Ms. Walz even testified that real estate agents would work extra hard to sell at least two (2) of the Moores' houses before the end of the year so that they would be eligible to attend

where there was no meaningful personal or social relationship between the taxpayer and the recipients of the entertainment may be considered to have occurred in a clear business setting. For example, entertainment of business representatives and civic leaders at the opening of a new hotel or theatrical production, where the clear purpose of the taxpayer is to obtain business publicity rather than to create or maintain the goodwill of the recipients of the entertainment, would generally be considered to be in a clear business setting.

the party. (*See* R. at 166.) Secondly, the Moores established that the 1989 party was entertainment of a clear business nature under circumstances where there was no meaningful personal or social relationship between the Moores and the recipients of the entertainment. *See* Treas.Reg. § 1.274–2(4). Mr. Moore testified that his sole motivation in hosting the annual parties was to promote sales of his homes. (*See* R. at 143.) Ms. Walz and Ms. Haworth corroborated Mr. Moore's testimony at trial by stating that from their perspective, the Moores' motive in hosting the annual parties was to advertise and promote the sale of their homes. (*See* R. at 169, 173–74.) Mr. Moore, Ms. Walz and Ms. Haworth all testified that they had no personal or social relationship beyond their business association, (*see* R. at 144, 165, 173), and both Ms. Walz and Mr. Moore testified as to the cursory nature of the Moores' interaction with their guests at the annual parties. (*See* R. at 145–46, 158–59, 169.) The Court FINDS that under these circumstances, the expense of the 1989 party is akin to one of the illustrations of entertainment occurring in a clear business setting contained in the Treasury Regulations, namely, the expense of entertaining business and civic leaders at the opening of a new hotel or theatrical production where the clear purpose of the taxpayer is to obtain publicity as opposed to maintaining goodwill. *See* Treas.Reg. § 1.274–2(4). The Court therefore CONCLUDES that the expense of the 1989 party was incurred in a clear business setting, as that term has been defined in the Treasury Regulations.

The Fourth Circuit's disposition of *Berkley* does not compel a different conclusion. The entertainment at issue in this case is similar to that in *Berkley* because it took place in a setting with substantial distractions and because it involved a fairly large number of people, some of whom were not business associates of the taxpayers. *See Berkley*, 623 F.2d at 905 n. 8. Nonetheless, the entertainment expense at issue in *Berkley* was incurred with no more than a general expectation of deriving some business benefit at some indefinite future time. *Id.* at 904. In contrast, the Moores incurred the expense of their annual parties for the specific purpose

of rewarding the real estate agents who had sold at least two (2) of their homes during the current fiscal year and encouraging those agents to sell at least two (2) additional homes to be built by the Moores in the succeeding fiscal year. In addition, Mr. Moore's uncontroverted testimony was that the sales of his homes tripled once he started having the annual party for real estate agents. (*See* R. at 146.) Given the dramatic effect which the annual parties had on the Moores' business, this Court does not find it difficult to believe that the entertainment aspect of the 1989 party was clearly subordinate to the business purpose of promoting the sale of homes, as required by *Berkley*. The Court therefore FINDS that the expense of the 1989 party was incurred in a clear business setting, as that phrase has been interpreted in this circuit, and DENIES the second count of the Government's counterclaim.

### D. Bad Debt Deduction

■ The final issue raised by the Government in the counterclaim is the bad debt deduction claimed by the Moores in 1989 for the $698,503 in unsecured loans to Creech. The Government contests this deduction on two grounds. First, the Government asserts that Creech's debt did not become worthless in 1989 because her year-end financial statement for that year reflected an interest in Lakeridge of $806,000 and a net worth of $767,825. Second, the Government argues that because the Moores based their decision to claim the bad debt deduction on Creech's financial statement, and because Creech's financial statement was not completed until April of 1990, the Moores could not have known that Creech's debt was worthless until after the close of the 1989 tax year. The Moores maintain that because of their familiarity with Creech and the Lakeridge project, they were able to reasonably conclude that Creech's debt was worthless before the end of the 1989 tax year.

I.R.C. § 166 and the Treasury Regulations interpreting that section govern the deductibility of bad debts. Section 166(a)(1) provides the general rule that a taxpayer "shall be allowed as a deduction any debt which becomes worthless within the taxable year."

I.R.C. § 166(a)(1); *see also* Treas.Reg. § 1.166–1(a)(1) (1995).

■ The taxpayer carries the burden of proving, by a preponderance of the evidence, entitlement to a bad debt deduction. *See, e.g., Cole v. Commissioner,* 871 F.2d 64, 67 (7th Cir.1989). To satisfy this burden, the taxpayer must prove the existence of a bona fide debt and the worthlessness of that debt during the tax year. *See* Treas.Reg. § 1.166–1(c) (1995); Treas.Reg. § 1.166–2 (1995). A bona fide debt arises from a valid and enforceable obligation on the part of a debtor to pay a fixed or determinable sum of money to a creditor. *See* Treas.Reg. § 1.166–1(c). In order to prove such a debt worthless, a taxpayer must show that the debt had some value at the end of one tax year and that some identifiable event occurred during the succeeding tax year which demonstrated the absence of the debt's current and potential value. *See, e.g., Cole,* 871 F.2d at 67; *see also Dustin v. Commissioner,* 53 T.C. 491, 501, 1969 WL 1559 (1969), *aff'd,* 467 F.2d 47 (9th Cir.1972).

The Government did not contest the existence of a bona fide debt in the present case. Therefore, the Moores need only have shown the worthlessness of their loan to Creech at the end of the 1989 tax year in order to prevail on the bad debt issue.

In determining the worthlessness of a debt, a court should "consider all pertinent evidence, including the value of the collateral, if any, securing the debt and the financial condition of the debtor." Treas.Reg. § 1.166–2(a) (1995). Facts which might indicate worthlessness include: " 'the debtor's serious financial reverses, insolvency, lack of assets ... bankruptcy, and receivership, as well as the debt's unsecured or subordinated status....' " *Cole,* 871 F.2d at 67 (quoting 2 Bittker, Federal Taxation of Income, Estates and Gifts § 33.3, at 33–11 (1981)). Facts which might indicate that a particular debt retains some value include: " 'the creditor's failure to press for payment (especially if the debtor is a relative or friend), willingness to make further advances, availability of collateral or guarantees by third parties, the debtor's earning capacity, minor defaults, payment of interest, and sluggish

business conditions.' " *Cole,* 871 F.2d at 67 (quoting 2 Bittker, Federal Taxation of Income, Estates and Gifts § 33.3, at 33–11 (1981)). The Eight Circuit Court of Appeals articulated the standard for evaluating these various circumstances as follows:

> The proper test to be used in determining the worthlessness of a debt is the exercise of sound business judgment.... If collection seems hopeless to a reasonable man knowledgeable in the field of business, a deduction is justified. Nothing in the [Internal Revenue] Code or [Treasury] Regulations requires a taxpayer to refrain from charging off a debt that he honestly and reasonably believes to be uncollectible, merely because the debtor might at some time and in some manner find himself able to pay. Otherwise stated, no creditor is required to be "an incorrigible optimist." But he also must not be a "stygian pessimist."

*Riss v. Commissioner,* 478 F.2d 1160, 1166 (8th Cir.1973) (citations omitted).

The record clearly demonstrates that the Moores' unsecured loan to Creech had value at the end of 1988. Mr. Moore, Creech, and Gary Carlton ("Carlton"), the accountant for the Lakeridge partnership and the Moores, all testified that the parties to the loan expected that Creech would repay the Moores out of her share of the profits from the Lakeridge partnership. (R. at 138, 187, 240.) Carlton also testified that Creech's interest in the Lakeridge partnership was worth at least $500,000 (R. at 235.) Creech's own financial statement from 1988 valued her interest in Lakeridge at $750,000. (*See* Pls.' Ex. 11.) Thus, the unsecured loans to Creech retained at least a substantial portion of their value at the end of the 1988 tax year.

The Moores also produced credible evidence which established the occurrence of some identifiable event in 1989 which demonstrated the worthlessness of Creech's debt to the Moores. Mr. Moore, Creech, and Carlton all testified that they were informed sometime in 1989 that NationsBank would not renew the financing for the Lakeridge project. (R. at 140, 184, 235.) Those same three witnesses also testified that NationsBank's refusal to renew financing in 1989

meant that Lakeridge could not be developed profitably, that NationsBank would probably obtain a deficiency against the Lakeridge partners, and that consequently, Creech would be unable to repay the unsecured loan from the Moores. (R. at 138–142, 184–187, 236–46.)

Although the Government correctly notes that her 1989 financial statement reflects that Creech had a net worth of $767,825, the Government's reliance on those records is misplaced. Creech herself testified that her 1989 financial statement was based on incomplete or incorrect information regarding the Lakeridge project. (R. at 185.) In addition, Creech specifically testified that her 1989 financial statement inaccurately valued her interest in Lakeridge at $806,000 when "everyone in town knew" that NationsBank's refusal to finance Lakeridge in the fall of 1989 meant that the project would lose money. (R. at 184–85.) If her 1989 financial statements had been adjusted to reflect Lakeridge's value after NationsBank's withdrawal of financing, Creech's net worth would have been, at best, a negative $38,175.

The Government's argument about the timing of the Moores' decision to take a bad debt deduction also lacks merit. As an initial matter, the Court is not convinced that data gathered after the close of the tax year but before taxes are due cannot be used to determine whether to take a bad debt deduction. *See, e.g., BRH Builders, Inc. v. United States,* 620 F.Supp. 7, 9–10 (C.D.Ill.1985) ("Relevant 'circumstances' may exist before or after the end of the tax year for which the deduction is claimed. The ... solvency of the debtor, and efforts to collect the debt (before and after the end of the relevant tax year) have been considered in determining a debt's worthlessness."). Nevertheless, assuming *arguendo* that the Government's interpretation of the law is correct, the Court is still not persuaded that the Moores should be precluded from taking a bad debt deduction for the 1989 tax year. The record contains credible evidence suggesting that the Moores did not rely exclusively on Creech's financial statement in deciding to claim their bad debt deduction. Creech testified that the bleak financial prospects for the Lakeridge project were widely known in the community in the fall of 1989. (R. at 184–85.) Moreover, both Mr. Moore and Creech testified as to their longstanding personal and business relationship, (R. at 134–35, 178), and Mr. Moore and Carlton testified that their decision to claim a bad debt deduction in 1989 was based at least in part on their personal familiarity with Creech, the failed Lakeridge project, and the effect of that project on Creech's financial condition in 1989. (R. at 138–40, 241–42.) That the Moores and their accountant were personally familiar with Creech's financial condition is further supported by the fact that their estimation of her minimal net worth in 1989 was in fact accurate, inasmuch as Creech declared bankruptcy as a result of her Lakeridge deficiency. (*See* R. at 236.)

The Court **FINDS** that the unsecured nature of the loan, the nonviability of the Lakeridge project without financing from Nations-Bank, and the effect of the failed Lakeridge project on Creech's 1989 financial condition establish by a preponderance of the evidence that Creech's debt was worthless at the end of 1989. Accordingly, the Court HOLDS that the Moores' decision to take a bad debt deduction in 1989 was an exercise of sound business judgment. The third count of the Government's counterclaim is DENIED.

## III. CONCLUSION

The Moores' claim that the enactment of the 1989 Manual and the 1989 Memorandum Agreement amounted to a regulatory taking of the Boy Scout Tract is premature. This Court declines to apply the futility exception to the directive of the Supreme Court that claims for regulatory takings in the wetlands context are not ripe until the § 404 permit process has been completed. Accordingly, the Moores' claim for a refund for an involuntary conversion loss relating to the Boy Scout Tract is DENIED.

The Moores have established that the sale and rental of homes within the eight (8) subdivisions at issue in the first count of the Government's counterclaim comprises a single undertaking, and therefore, a single non-passive activity. The parties have stipulated that the income-producing operations of the

eight (8) contested subdivisions were owned by the same persons and conducted at the same physical location so as to satisfy the requirements of the basic undertaking rule. In addition, the basic activity rule provides that each of these separate undertakings also constitutes a separate activity. Furthermore, because the sale of homes predominated in each of these separate activities, they were properly characterized as non-passive. Therefore, the first count of the Government's counterclaim is DENIED.

The Moores have also satisfied the Court that the expense of the 1989 party was incurred in a clear business setting, as that phrase has been defined in the Treasury Regulations and interpreted in case law from this circuit. Any reasonable attendee of the 1989 party would have known that the Moores had no significant motive for throwing the party other than promoting the sale of their homes. In addition, the 1989 party occurred under circumstances where there was no meaningful personal or social relationship between the Moores and the attendees of the party. Lastly, the dramatic increase in the sale of homes constructed by the Moores which resulted from the annual parties establishes that the entertainment aspect of the 1989 party was clearly subordinate to the business aspect, as required by controlling case law from this circuit.

The Moores have also carried their burden on the bad debt issue. The record clearly demonstrates that the Moores' unsecured loans to Creech had value at the end of 1988 and that some identifiable event occurred in 1989 which demonstrated the worthlessness of Creech's debt to the Moores at the end of 1989. Accordingly, the last count of the Government's counterclaim is also **DENIED.**

The clerk is **DIRECTED** to send copies of this opinion to counsel of record.

**IT IS SO ORDERED.**