LAKEWOOD ASSOCIATES, a Virginia General Partnership, Plaintiff,

v.

UNITED STATES, Defendant.

No. 97–303L.

United States Court of Federal Claims.

Dec. 2, 1999.

Douglas E. Kahle, Pender & Coward, P.C., Virginia Beach, Virginia, attorney of record for the plaintiff. Paul A. Driscoll, Pender & Coward, P.C., Virginia Beach, Virginia, of counsel.

Donald F. Rosendorf, Environmental & Natural Resources Division, United States Department of Justice, Washington, D.C., with whom was Catherine McCabe, Assistant Chief, General Litigation Section, attorneys of record for the defendant.

## OPINION

HORN, Judge.

The above-captioned case comes before the court on the plaintiff's motion for summary judgment and the defendant's motion for dismissal, or, in the alternative, cross motion for summary judgment. Plaintiff, Lakewood Associates, has filed a motion for summary judgment arguing that its failure to receive an appealable final decision on its wetlands development permit application is not a bar to judicial review because continuing the permitting process would have been futile. Plaintiff argues that compliance with the Corps' requests would have been burdensome and without legitimate purpose. Plaintiff contends that it is entitled to summary judgment and a finding that the government effected a taking by depriving it of all economic use of the property in violation of the Fifth Amendment to the United States Constitution.

The defendant, the United States, counters that plaintiff's claim should be dismissed as unripe because Lakewood failed to participate fully in the available administrative process. The defendant also claims that Lakewood is collaterally estopped from arguing futility by the decision of another federal court in *Robert G. Moore and Frances R. Moore v. United States*, 943 F.Supp. 603 (E.D.Va.1996). Alternatively, the government has moved for summary judgment, arguing that there was no Fifth Amendment taking because, according to the defendant, Lakewood cannot show a reduction in its property's value based on a reasonable development expectation due to existing county zoning restrictions which preclude residential development of the property.

After careful consideration of the record, the parties' filings, and the relevant law, the court holds that plaintiff's claim must be dismissed as premature. Plaintiff has failed to show that continuation in the permitting process would have been futile.

## FACTS

The plaintiff, Lakewood Associates (Lakewood), is a Virginia general partnership organized under the laws of the Commonwealth of Virginia, with its principal place of business in Virginia Beach, Virginia. R.G. Moore is the President of Lakewood, and R.G. Moore Building Corporation is a general partner in the company. On or about September 8, 1987, Lakewood purchased 632.4 acres of unimproved real estate (the Elbow Lake Property), located on the south side of

Elbow Road in Chesapeake, Virginia. Lakewood purchased the Elbow Lake Property for $8,860,000.00 from R.G. Moore Building Corporation, and intended to use the Elbow Lake Property for residential development. On October 1, 1988, R.G. Moore purchased a contiguous 59.7 acre parcel of land known as the "Boy Scout Tract," which was also intended for residential development along with the Elbow Lake Property. At the times of their respective acquisitions, both the Elbow Lake Property and the Boy Scout Tract were zoned for agricultural use only.

Pursuant to 33 U.S.C. § 1344 (1988), popularly known as § 404 of the Clean Water Act, the United States Army Corps of Engineers (the Corps) has jurisdiction over areas deemed to be wetlands, and development of such areas cannot take place unless a permit is issued to the landowner by the Corps. Therefore, subsequent to Lakewood's acquisition of the Elbow Lake Property, plaintiff employed Douglas S. Davis, a wetlands ecologist, to prepare a preliminary wetlands report in February 1988 for submittal to the Corps. Later, in June of 1988, Davis prepared and submitted an addendum to the report which covered the Boy Scout Tract. Davis' initial report concluded, in part, that:

> 1. The bottomland swamp around the perimeter of the property is unquestionably a wetlands within the Corps "404" regulatory jurisdiction. A Corps permit will be required to place fill in this wetland area. The bottomland swamp appears to present little conflict with the proposed site plan, however.
>
> 2. There is a strong likelihood that a significant area of isolated wetlands is located in the interior of the property. If these areas are ultimately identified as wetlands then they too will fall within the Corps "404" jurisdiction and permits will be required for development. If determined to be wetlands, these areas represent a major conflict with the proposed site plan.

In the June, 1988 addendum, Davis examined the Boy Scout Tract for the first time with regard to wetlands issues and re-examined the interior of the Elbow Lake Property. He concluded that much of the interior flats of the Elbow Lake Property met the minimum requirements to be classified as wetlands by the Corps pursuant to section 404. However, he noted that the Corps and the Environmental Protection Agency (EPA) might consider portions of these wetlands to be "negotiable" for development purposes. Regarding the Boy Scout Tract, Davis determined that much of that parcel was "considerably drier than the rest of the project site," and that the Corps likely would consider the parcel to be upland rather than wetland.

While Davis was preparing his reports, the plaintiff was attempting to change the zoning status of the Elbow Lake Property and the Boy Scout Tract. On February 8, 1988, Lakewood filed an application with the City of Chesapeake for re-zoning of the properties from agricultural to residential. Despite a recommendation from the local planning commission that the application be denied, the Chesapeake City Council approved the re-zoning in October, 1988. A group of concerned citizens then submitted a petition to the Chesapeake Circuit Court calling for a voter referendum on the issue. The circuit court ordered the referendum, and it was held on March 7, 1989. Of those citizens participating, 96.4% (11,800 out of 12,347) voted against the re-zoning. R.G. Moore Building Corp. then appealed the lower court decision allowing the referendum. On April 20, 1990, in *R.G. Moore Bldg. Corp. v. Committee for the Repeal of Ordinance R(C)–88–13*, 239 Va. 484, 391 S.E.2d 587 (1990), the Virginia Supreme Court upheld the decision of the Chesapeake Circuit Court.

In January of 1991, Lakewood submitted a Joint Application for an individual section 404 permit, along with two cover letters, to the Corps and the Virginia Marine Resources Commission (VMRC). A plan submitted with the Joint Application proposed to develop all of the Elbow Lake Property and the Boy Scout Tract, including jurisdictional wetlands, as a residential development. In its cover letter, Lakewood acknowledged:

> [T]here exists numerous sites in the Tidewater, Virginia area on which it could develop a residential project which would have less impact to jurisdictional wetlands. These other sites are not owned by the

applicant but they could be reasonably obtained, utilized, expanded or managed in order to fulfill the basic purpose of the proposed activity such that other than the ownership issue these sites are believed to be practicable alternatives.

The plaintiff states in its complaint that these practicable alternative sites consist, in substantial part, of large tracts of land owned by a general partner of Lakewood, and that the alternative tracts contain large areas of uplands.

At the time of Lakewood's acquisition of the Elbow Lake Property and the Boy Scout Tract, the Corps used a document known as the "1987 Manual" to determine the nature and extent of jurisdictional waters, including wetlands, on a given site for purposes of the Clean Water Act. In 1989, the Corps and the EPA promulgated the "1989 Manual," and the Corps then began to use that 1989 Manual to determine the nature and extent of jurisdictional waters. The 1989 Manual, as compared to the 1987 Manual, expanded the definition of wetlands. In addition, on February 7, 1990, a Memorandum of Agreement (MOA) between the Corps and the EPA became effective, and the MOA provided for "sequencing" in the processing of § 404 permit applications. Sequencing refers to the permit-granting system whereby impacts to wetlands are first to be avoided to the extent possible, then minimized to the extent appropriate and practicable, and, as a last step, compensated for by the creation, restoration and/or preservation of other wetlands.[1]

The parcels for which Lakewood sought a § 404 permit in its 1991 Joint Application are within the geographical territory and jurisdiction of the Norfolk, Virginia, District of the Corps. The Norfolk District was using a sequencing practice before the MOA made it mandatory. However, prior to the adoption of the MOA, an applicant in the Norfolk District could bypass the first two steps of the sequencing process and go straight to compensation for wetlands impacts by offering a wetlands mitigation package. Thus, absent the proffer of wetlands mitigation packages, the wetlands on Lakewood's properties under the Joint Application would have been subject to sequencing at the time of their acquisition. Lakewood proffered no mitigation for the wetland impacts which it proposed in its Joint Application to the Corps and the VMRC for a § 404 permit.

The Virginia State Water Control Board (SWCB) was the first regulatory authority to request more information from the plaintiff concerning the proposed development.[2] On February 26, 1991, the SWCB responded by letter to Lakewood's application for a state water control certification. In part, the letter read:

> Wetlands perform many important water quality functions, including ground water recharge, filtering of runoff and surface waters, sediment trapping, and pollutant trapping. In order to determine the likely impacts to water quality functions, we need a more complete characterization of the wetlands involved. In addition to the wetland delineation map included in the application, we request a list of plant species, field soil data, and hydrology for each of the different wetland types ... at the site, and the rationalization for the type determination.
>
> Palustrine, forested wetlands are the fastest disappearing type of wetland in Virginia. Recognizing the environmental and economical values of wetlands, the Commonwealth of Virginia is striving for "no net loss" of wetland acreage and function. To meet this goal, we are requesting 1:1 in kind mitigation for wetlands permitted to be impacted. We, therefore, request a mitigation plan which will address the wetland losses proposed by your project. This plan, and the additional information requested, should be submitted to the State Water Control Board through the Virginia Marine Resources Commission at your earliest convenience.

---

1. On August 17, 1991, congressional legislation discontinued the 1989 Manual and the Corps reverted to the 1987 Manual for determining the nature and extent of jurisdictional wetlands. The MOA was left in place.

2. On February 7, 1991, the City of Chesapeake Wetlands Board had written to plaintiff and informed it that the project as proposed did not require a permit from the Board.

Next, on March 5, 1991, the Corps and the SWCB issued a Joint Federal/State Public Notice concerning Lakewood's proposed development. The Notice stated that:

> The Corps of Engineers is soliciting comments from the public; Federal, state, and local agencies and officials; Indian Tribes; and other interested parties in order to consider and evaluate the impacts of this proposed activity. Any comments received will be considered by the Corps of Engineers to determine whether to issue, modify, condition or deny a permit for this proposal.

Consistent with the actions of the SWCB, the VMRC informed Lakewood by letter on March 12, 1991 that plaintiff's proposed project was not within an area over which the VMRC was exercising jurisdiction, and, therefore, no permit was required from the VMRC. However, the VMRC noted that plaintiff might need a permit from a local wetlands board and/or authorization from the Corps.

On March 19, 1991, in response to the Joint Federal/State Public Notice, the SWCB put forth official comments in a letter to the Corps. The SWCB stated that the overall effect on water quality of the project as proposed was "decidedly negative," and that more information was needed from the applicant. The SWCB noted that it already had requested additional information from Lakewood, and suggested that "a thorough alternatives analysis and documentation of how the applicant has tried to avoid and minimize wetland impacts should be submitted." The United States Fish and Wildlife Service responded to the Public Notice by mail on March 29, 1991, and, like the SWCB, requested that the Corps require an alternatives analysis. The Fish and Wildlife Service also recommended that a wetlands delineation be conducted for the project location so that an accurate environmental impact assessment could be done.

On April 5, 1991, the EPA also voiced concern to the Corps that additional information was needed from Lakewood. In a letter to the Corps, the Chief of EPA's Wetlands Section noted that the Clean Water Act § 404 permitting program has a policy that "[d]redged material should not be discharged into waters of the United States unless it can be demonstrated that such a discharge will not have an unacceptable adverse impact (individually or cumulatively) on the aquatic ecosystem." The EPA further stated that an important component of the policy was the "alternatives test" which "establishes that no discharge can be permitted if there is a practicable alternative with less environmental impact on the aquatic environment." Regarding Lakewood's application, the letter observed that:

> [I]n order to satisfy both the unacceptable adverse impact test and the alternatives test it is incumbent upon the applicant to supply the information necessary to evaluate these components as they apply to their project. The present application submitted by Lakewood, however, lacks this critical information. We therefore request that they submit a detailed alternatives analysis and develop further environmental information on the wetlands proposed to be filled by the project. That information should include, at a minimum a detailed wetland delineation of the property, a detailed description of the various wetland vegetative communities, an analysis of the function and value of those wetlands and any attempts made to avoid or minimize adverse impacts. Only after all attempts have been made to avoid and minimize adverse impacts can wetlands compensation be considered.

Lakewood's Joint Application for a § 404 permit was assigned to Kenneth Kimidy, a staff environmental scientist at the Corps' Norfolk District office. Kimidy prepared an initial application review which was discussed in a letter to plaintiff dated April 29, 1991, and signed by William H. Poore, Jr., the chief of the Norfolk District's Regulatory Branch. In the letter, the Corps stated that its initial review showed the proposed project could impact up to 472 acres of wetlands. The Corps noted Lakewood's acknowledgment of the existence of practicable alternative sites, but stated that those alternatives "must be evaluated as part of the permit review process." Thus, Lakewood was asked to "provide [the Norfolk District] office with

all documentation of alternatives which were reviewed by Lakewood Associates." In addition, the Corps stated:

[A]pplicants should be aware that the Corps will establish and evaluate practicable alternatives in terms of the project's basic purpose. While we will fully consider the applicant's views and information regarding the project's purpose and the existence of practicable alternatives, this review must be performed without undue deference to the applicant's wishes.

Your proposed discharge and associated activity is not dependent on being located in a water of the United States. Therefore, we strongly suggest that you consider utilizing the upland portion of the property or another upland site. If this is acceptable, please advise us in writing. However, if you wish to pursue your project as proposed, please provide the following information:

1. The criteria used to determine the minimum feasible acreage of property needed to meet the project's basic purpose as well as an economic analysis of the project which shows the criteria associated with an acceptable project.

2. The specific reasons why encroachment into waters of the United States at the proposed site is necessary.

3. A detailed alternatives analysis that objectively evaluates the feasibility of utilizing the upland portions of your existing property (avoidance), the minimization of encroachment into waters of the United States and associated wetlands, and/or the use of other existing upland parcels to achieve the project's purpose using the criteria stated in information requirement (1) above.

4. A detailed wetland delineation of the site which identifies the vegetation, soils, and hydrology at the site. You should contact a consultant familiar with the Federal Manual for Identifying and Delineating Jurisdictional Wetlands.... If you do not wish to perform the subject delineation using a consultant, it will be approximately

six (6) months before a member of [the Corps'] staff will be able to provide the delineation assistance necessary for such a large parcel.

5. A set of detailed plans which show the entire area to be impacted as well as elevations at the site on 2–foot contours.

6. Coordination with the Virginia Department of Conservation and Recreation, Division of Natural Heritage regarding potential impacts on the North Landing River Natural Preserve. The project must also be coordinated with the U.S. Fish and Wildlife Service to determine if there may be a Federal endangered species concern.

Our receipt of the aforementioned information is necessary before we can further process your application.

The Corps sent a second letter, dated June 24, 1999, to Lakewood asking for submittal of the previously requested information. On August 16, 1991, the Corps wrote to Lakewood and advised that the Corps would administratively withdraw the Application if Lakewood did not provide the necessary information. Lakewood failed to respond and the permit file was closed on September 15, 1991.

There was no further contact between Lakewood and the Corps regarding the proposed project until January 30, 1992, when Robert Kerr of Langley & McDonald, P.C. came to the Norfolk District office to discuss delineation of the wetlands on the Elbow Lake Property and the Boy Scout Tract. Lakewood's lender, Signet Bank, had hired Langley & McDonald to perform a wetlands delineation and to ascertain the feasibility of developing the uplands portions. Langley & McDonald performed the delineation using the 1987 Manual and concluded that Lakewood's subject properties contained 288.1 acres of uplands, 298.3 acres of jurisdictional wetlands, and 46 acres of land believed to be predominantly wetlands.[3] The Corps later confirmed this wetlands delineation in a letter to Lakewood dated June 13, 1993.

---

3. The parties have stipulated that, under the 1989 Manual, there would be 465.9 acres of jurisdictional wetlands.

On April 9, 1996, Lakewood and R.G. Moore Building Corp. sent a joint letter to the Corps requesting an extension of the validity period of the confirmed 1993 delineation. They explained:

Primarily due to the poor economy and offsite utility problems, we have been unable to proceed with the development of this property. The only activity that has commenced since the wetland delineation confirmed on June 15, 1993 is the logging of portions of the property at the request of the Commonwealth of Virginia, Department of Forestry, due to the infestation of the Southern Pine Beetle.

On June 13, 1996, the Corps granted Lakewood's request and extended the June 1993 delineation to June 15, 1998.

One week prior to this delineation extension by the Corps, on June 6, 1996, the United States District Court for the Eastern District of Virginia issued a decision in *Robert G. Moore and Frances R. Moore v. United States,* 943 F.Supp. 603 (E.D.Va.1996). In that case, the Moores sought a tax refund on the basis that changes in the wetlands regulatory program had devalued the Boy Scout Tract and caused them a loss by taking away their ability to develop a residential subdivision on the Tract. The Moores asserted, in part, that it would have been futile to respond to the Corps' requests for more information when the Moores applied for a section 404 permit. The United States counterclaimed, contesting the deductability of certain business and bad debt expenses listed on the Moores' 1989 tax return. The district court denied the Moores' refund claim and the government's counterclaim. Neither party appealed.

On April 28, 1997, Lakewood filed a complaint in this court. Plaintiff later amended its complaint on December 28, 1998, but it neither added additional parties nor plead additional causes of action. Plaintiff believed it was necessary to amend the original complaint "in order to refine its factual allegations with matters learned in discovery." [4] Plaintiff alleges in Count One of its amended complaint that:

The Corps has completely frustrated Plaintiff's reasonable investment-backed expectations, has diminished substantially the economic value of the Property, and has deprived Plaintiff of all practical, beneficial and economic use of the Property so as to constitute a taking of the Property without just compensation in violation of the Fifth Amendment to the United States Constitution.

In Count Two, Lakewood alleges a temporary taking for the period between April 29, 1991 and the present because plaintiff allegedly has been denied any economically viable use of the property in violation of the Fifth Amendment to the United States Constitution. As a result of these alleged takings, plaintiff seeks damages in the amount of $10,000,000.00 and other "necessary and appropriate" relief.

Subsequently, in the above-captioned case, plaintiff filed a motion for summary judgment. Plaintiff argues that its failure to receive an appealable final decision on its § 404 permit application is not a bar to judicial review because continuing the permitting process would have been futile. Lakewood contends that the Corps' requested information was unnecessary, and that compliance with the Corps' requests would have been burdensome and without legitimate purpose. Plaintiff then asserts that it is entitled to summary judgment in that "the Corps' actions deprived Lakewood of substantially all economic use of its property costing it $10 million."

The government then filed its own motion for summary judgment, in conjunction with

---

**4.** In a separately filed action in another court, on December 29, 1997, the U.S. Tax Court issued a decision in *Lakewood Assocs. v. Commissioner,* 109 T.C. 450, 1997 WL 791494 (1997). In that case, Lakewood had claimed a loss deduction on its 1989 federal tax return on the basis that changes in the wetlands regulatory program had devalued its property by taking away its ability to develop a residential subdivision on the property.

The Tax Court denied the refund because there had been no realization event which would have accurately fixed the amount of the claimed loss. On December 4, 1998, the United States Court of Appeals for the Fourth Circuit affirmed the Tax Court's decision in *Lakewood Associates v. Commissioner,* No. 98–1499, 1998 U.S.App. LEXIS 31434 (4th Cir. Dec. 4 1998).

a motion to dismiss. Defendant argues first that, because Lakewood failed to participate fully in the available administrative process, the case should be dismissed as unripe. The defendant also claims that Lakewood is collaterally estopped from arguing futility by the decision of another federal court in *Robert G. Moore and Frances R. Moore v. United States,* 943 F.Supp. 603 (E.D.Va. 1996). The government also asserts that Lakewood cannot show a reduction in value of its property because Lakewood cannot show reasonable development expectations for the property due to existing county zoning restrictions which preclude residential development of the property.

### *DISCUSSION*

The defendant has filed a motion to dismiss pursuant to Rules 12(b)(1) and 12(h)(3) of the Rules of the United States Court of Federal Claims for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted. Subject matter jurisdiction may be challenged at any time by the parties, by the court sua sponte, or on appeal. *Booth v. United States,* 990 F.2d 617, 620 (Fed.Cir.1993) (rehearing denied); *United States v. Newport News Shipbuilding & Dry Dock Co.,* 933 F.2d 996, 998 n. 1 (Fed.Cir.1991).

Once jurisdiction is challenged by the court or the opposing party, the plaintiff bears the burden of establishing jurisdiction. *McNutt v. General Motors Acceptance Corp. of Indiana,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936). A plaintiff must establish jurisdiction by a preponderance of the evidence. *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 748 (Fed.Cir.1988); *Alaska v. United States,* 32 Fed.Cl. 689, 695 (1995), *appeal dismissed,* 86 F.3d 1178, 1996 WL 285759 (Fed.Cir.1996). When construing the pleadings pursuant to a motion to dismiss, the court should not grant the motion unless " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief.' " *Son Broadcasting, Inc. v. United States,* 42 Fed.Cl. 532, 537 (1998) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct.

99, 2 L.Ed.2d 80 (1957)) (alterations in original).

Pursuant to RCFC 8(a)(1) and Federal Rule of Civil Procedure 8(a)(1), a plaintiff need only state in the complaint "a short and plain statement of the grounds upon which the court's jurisdiction depends." However, "[d]etermination of jurisdiction starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed." *Holley v. United States,* 124 F.3d 1462, 1465 (Fed.Cir. 1997). "[C]onclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss." *Briscoe v. La-Hue,* 663 F.2d 713, 723 (7th Cir.1981), *aff'd,* 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983).

When deciding on a motion to dismiss based on either lack of subject matter jurisdiction or failure to state a claim, this court must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the plaintiff's favor. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *see also Henke v. United States,* 60 F.3d 795, 797 (Fed.Cir.1995); *Hamlet v. United States,* 873 F.2d 1414, 1416 (Fed.Cir.1989). If a defendant challenges jurisdiction or plaintiff's claim for relief, however, the plaintiff cannot rely merely on allegations in the complaint but must instead bring forth relevant, competent proof to establish jurisdiction. *McNutt v. General Motors Acceptance Corp. of Indiana,* 298 U.S. at 189, 56 S.Ct. 780; *see also Land v. Dollar,* 330 U.S. 731, 735 n. 4, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947); *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d at 747; *Catellus Dev. Corp. v. United States,* 31 Fed.Cl. 399, 404–05 (1994). The court may consider all relevant evidence in order to resolve the factual dispute, including evidentiary matters outside the pleadings. *Indium Corp. of Am. v. Semi–Alloys, Inc.,* 781 F.2d 879, 884 (Fed.Cir.1985), *cert. denied,* 479 U.S. 820, 107 S.Ct. 84, 93 L.Ed.2d 37 (1986).

 In order for this court to have jurisdiction over a plaintiff's complaint, the Tucker Act requires that the plaintiff identify

an independent substantive right enforceable against the United States for money damages. 28 U.S.C. § 1491. The Tucker Act states:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1). As interpreted by the United States Supreme Court, this Act waives sovereign immunity to allow jurisdiction over claims (1) founded on an express or implied contract with the United States; (2) for a refund from a prior payment made to the government; or (3) based on federal constitutional, statutory, or regulatory law. *United States v. Testan,* 424 U.S. 392, 400, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976) (quoting *Eastport Steamship Corp. v. United States,* 178 Ct.Cl. 599, 605–06, 372 F.2d 1002 (1967)); *see also Palmer v. United States,* 168 F.3d 1310, 1314 (Fed.Cir.1999); *Stinson Lyons & Bustamante, P.A. v. United States,* 33 Fed. Cl. 474, 478 (1995), *aff'd,* 79 F.3d 136 (Fed. Cir.1996). A waiver of traditional sovereign immunity "cannot be implied but must be unequivocally expressed." *Saraco v. United States,* 61 F.3d 863, 864 (Fed.Cir.1995) (quoting *United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969)), *cert. denied,* 517 U.S. 1166, 116 S.Ct. 1565, 134 L.Ed.2d 665 (1996).

■ The Tucker Act, however, merely confers jurisdiction on the United States Court of Federal Claims; "it does not create any substantive right enforceable against the United States for money damages." *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (quoting *United States v. Testan,* 424 U.S. at 398–99, 96 S.Ct. 948 (1976)), *reh'g denied,* 446 U.S. 992, 100 S.Ct. 2979, 64 L.Ed.2d 849 (1980); *see also Saraco v. United States,* 61 F.3d at 865 (citing *Zumerling v. Devine,* 769 F.2d 745, 749 (Fed.Cir.1985) (citing *United States v. Testan,* 424 U.S. at 398, 96 S.Ct. 948 (1976)));

*see also United States v. Connolly,* 716 F.2d 882, 885 (Fed.Cir.1983) (en banc), *cert. denied,* 465 U.S. 1065, 104 S.Ct. 1414, 79 L.Ed.2d 740 (1984). Individual claimants, therefore, must look beyond the jurisdictional statute for a waiver of sovereign immunity. *United States v. Mitchell,* 445 U.S. at 538, 100 S.Ct. 1349. For claims founded on the Constitution, a statute or a regulation to be successful, "the provisions relied upon must contain language which could fairly be interpreted as mandating recovery of compensation from the government." *United States v. Testan,* 424 U.S. at 400, 96 S.Ct. 948 (quoting *Eastport Steamship Corp. v. United States,* 178 Ct.Cl. 599, 607, 372 F.2d 1002 (1967)); *see also John Doe v. United States,* 100 F.3d 1576, 1579 (Fed.Cir.1996).

Defendant asserts that plaintiff's complaint, alleging a constitutional taking of plaintiff's private property, should be dismissed for lack of ripeness because Lakewood failed fully to participate in the available administrative permitting process before bringing its claim in this court. Since a wetlands development permit has neither been granted nor denied by the Corps, defendant contends that no determination properly can be made as to whether there has been a taking. Lakewood, however, counters that "[f]utility excuses the normal requirement for finality as a prerequisite for judicial review of agency action," and that the facts of this case "reflect that there is no likelihood Lakewood would have received either a permit or a denial of its application."

■ The Tucker Act grants the United States Court of Federal Claims jurisdiction to entertain claims alleging that the government has taken private property for public use in violation of the Fifth Amendment of the United States Constitution. The United States Supreme Court has declared: "[i]f there is a taking, the claim is 'founded upon the Constitution' and within the jurisdiction of the [Claims Court] to hear and determine." *Preseault v. ICC,* 494 U.S. 1, 12, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990) (quoting *United States v. Causby,* 328 U.S. 256, 267, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946)); *Applegate v. United States,* 25 F.3d 1579, 1581 (Fed.Cir.1994); *Osprey Pacific Corp. v.*

*United States,* 41 Fed.Cl. 150, 157 & n. 6 (1998).

■ The Takings Clause of the Fifth Amendment to the United States Constitution provides in pertinent part: "nor shall private property be taken for public use without just compensation." U.S. Const. amend. V. The purpose of the Fifth Amendment is "to prevent the government 'from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" *Eastern Enters. v. Apfel,* 524 U.S. 498, 118 S.Ct. 2131, 2145, 141 L.Ed.2d 451 (1998) (quoting *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960)); *accord Janowsky v. United States,* 133 F.3d 888, 892 (Fed.Cir.1998); *Florida Rock Indus., Inc. v. United States,* 45 Fed. Cl. 21, 24 (1999). There is a "clear principle of natural equity that the individual whose property is thus sacrificed [for the public good] must be indemnified." *Pumpelly v. Green Bay & Mississippi Canal Co.,* 13 Wall. 166, 80 U.S. 166, 179, 20 L.Ed. 557 (1871).

The pertinent regulations which plaintiff alleges to have brought about a taking of its property are provisions of the Clean Water Act (CWA), 33 U.S.C.A. §§ 1251–1376 (West 1994 & Supp.1999). In particular, under section 301 of the CWA, 33 U.S.C.A. § 1311,[5] "any discharge of dredged or fill materials into 'navigable waters'—defined as the 'waters of the United States'—is forbidden unless authorized by a permit issued by the Corps of Engineers pursuant to § 404, 33 U.S.C. § 1344." *United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 123, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985) (footnote omitted).[6] The term "waters of the United States," in turn, is defined as:

(1) All waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;

(2) All interstate waters including interstate wetlands;

(3) All other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce including any such waters:

(i) Which are or could be used by interstate or foreign travelers for recreational or other purposes; or

(ii) From which fish or shellfish are or could be taken and sold in interstate or foreign commerce; or

(iii) Which are used or could be used for industrial purpose by industries in interstate commerce;

(4) All impoundments of waters otherwise defined as waters of the United States under the definition;

(5) Tributaries of waters identified in paragraphs (a)(1)-(4) of this section;

(6) The territorial seas;

(7) Wetlands adjacent to waters (other than waters that are themselves wetlands) identified in paragraphs (a)(1)-(6) of this section.

Waste treatment systems, including treatment ponds or lagoons designed to meet the requirements of CWA (other than cooling ponds as defined in 40 CFR 123.11(m) which also meet the criteria of this definition) are not waters of the United States.

33 C.F.R. § 328.3 (1991).

The parties in the above-captioned case have stipulated that the property in question does contain wetlands which are within the

---

**5.** In pertinent part, 33 U.S.C.A. § 1311(a) states that "[e]xcept as in compliance with this section and sections 1312, 1316, 1317, 1328, 1342, and 1344 of this title, the discharge of any pollutant by any person shall be unlawful."

**6.** Under 33 U.S.C.A. § 1362(12), the terms "discharge of a pollutant" and "discharge of pollu-

tants" are defined as "any addition of any pollutant to navigable waters from any point source, [or] any addition of any pollutant to the waters of the contiguous zone or the ocean from any point source other than a vessel or other floating craft."

Corps' jurisdiction,[7] and that plaintiff needed to acquire a § 404 permit from the Corps prior to developing the site. Lakewood's complaint alleges that there was a constructive denial of its permit application by the government. Thus, according to the plaintiff, the government caused Lakewood's property to lose substantially all of its value since the property now can serve only agricultural, rather than residential, purposes.

■■■ There exists no precise analytical framework or set formula for ascertaining exactly when the impact of a government regulation requires compensation by the government. *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1977), *reh'g denied*, 439 U.S. 883, 99 S.Ct. 226, 58 L.Ed.2d 198 (1978); *Avenal v. United States*, 100 F.3d 933, 937 (Fed.Cir.1996). Determining whether a taking has occurred is an ad hoc factual inquiry that incorporates several factors identified by the Supreme Court as being particularly relevant and significant: (i) the character of the government action, (ii) the economic impact of the regulation, and (iii) the extent that the regulation interferes with reasonable investment-backed expectations. *Id.* at 124, 98 S.Ct. 2646; *Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 224, 225, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986); *Florida Rock Indus., Inc. v. United States*, 18 F.3d 1560, 1564 (Fed.Cir.1994) (rehearing denied); *see also Concrete Pipe & Products of Cal., Inc. v. Construction Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 643–47, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993); *United States v. Central Eureka Mining Co.*, 357 U.S. 155, 168, 78 S.Ct. 1097, 2 L.Ed.2d 1228, *reh'g denied*, 358 U.S. 858, 79 S.Ct. 9, 3 L.Ed.2d 91 (1958).

■■■ The Supreme Court announced a per se rule in *Lucas v. South Carolina Coastal Council*, finding that a regulation depriving real property of all economic value would give rise to a taking without considering the other *Penn Central* factors delineated above. 505 U.S. 1003, 1029, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). The Supreme Court

qualified this rule, however, with the exception that a total loss of value would not trigger a taking if "the nature of the owner's estate shows that the proscribed use interests were not part of his title to begin with...." *Id.* at 1027, 112 S.Ct. 2886. This "antecedent inquiry" into limitations that inhere in the owner's title is made by reference to state property or nuisance law. *See id.* at 1029, 112 S.Ct. 2886. Regarding governmental land-use regulations, they may under extreme circumstances amount to a taking of an affected property. *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. at 126, 106 S.Ct. 455 (citing *Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985); *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978)). The necessary circumstances are present only " 'if the ordinance does not substantially advance legitimate state interests ... or denies an owner economically viable use of his land.' " *Id.* (quoting *Agins v. Tiburon*, 447 U.S. 255, 260, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980)).

■■■ However, "a claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." *Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. at 186, 105 S.Ct. 3108. A ripeness determination is a fact-intensive analysis which requires an evaluation of both the fitness of the issues for judicial decision and any hardship to the parties of withholding consideration of their dispute. *See Abbott Labs. v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), *abrogated on other grounds, Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977); *Howard W. Heck, and Assocs., Inc. v. United States*, 37 Fed.Cl. 245, 250 (1997), *aff'd*, 134 F.3d 1468 (Fed.Cir. 1998).

---

7. As noted above, the percentage of the property which can be characterized as wetlands varies depending on whether a delineation is performed

using the 1987 Manual or the 1989 Manual. This difference does not impact the court's analysis of defendant's motion to dismiss.

The United States Supreme Court has stated:

> A requirement that a person obtain a permit before engaging in a certain use of his or her property does not itself "take" the property in any sense: after all, the very existence of a permit system implies that permission may be granted, leaving the landowner free to use the property as desired. Moreover, even if the permit is denied, there may be other viable uses available to the owner. Only when a permit is denied and the effect of the denial is to prevent "economically viable" use of the land in question can it be said that a taking has occurred.

*United States v. Riverside Bayview Homes, Inc.*, 474 U.S. at 127, 106 S.Ct. 455; *accord Tabb Lakes, Ltd. v. United States*, 10 F.3d 796, 801 (Fed.Cir.1993); *see also Mac-Donald, Sommer & Frates v. County of Yolo*, 477 U.S. 340, 348, 106 S.Ct. 2561, 91 L.Ed.2d 285 ("It follows from the nature of a regulatory takings claim that an essential prerequisite to its assertion is a final and authoritative determination of the type and intensity of development legally permitted on the subject property."), *reh'g denied*, 478 U.S. 1035, 107 S.Ct. 22, 92 L.Ed.2d 773 (1986); *Howard W. Heck, and Assocs., Inc. v. United States*, 134 F.3d at 1471. The finality requirement is also justified on the basis that the economic impact of a challenged action and the extent to which it interferes with reasonable investment-backed expectations cannot be evaluated until an administrative agency arrives "at a final, definitive position regarding how it will apply the regulations at issue to the particular land in question." *Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. at 191, 105 S.Ct. 3108.

Initially, Lakewood argues that, regardless of its futility contention, the Corps should have denied plaintiff's permit application outright due to a presumption in the regulations pertaining to § 404 permitting. According to those regulations, for non-water dependant land uses, such as that proposed by Lakewood, "practicable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated oth-

erwise." *See* 40 C.F.R. § 230.10(a)(3) (1991). Plaintiff acknowledged in its application that its proposed development would have impacted jurisdictional wetlands and showed that it could have obtained other properties which it termed practicable alternatives. Thus, Lakewood believes the Corps should have followed the regulatory presumption and denied the § 404 permit application to encourage development of the other sites, because when practicable alternatives are identified the Corps cannot issue a dredge or fill permit. *See generally National Wildlife Fed. v. Whistler*, 27 F.3d 1341, 1344 (8th Cir.1994) (discussing the regulatory presumption of practicable alternatives).

The plaintiff, however, fails to give proper recognition to another regulation which indicates that the Corps was justified in seeking additional information on Lakewood's suggested practicable alternatives. In particular, the language of 40 C.F.R. § 230.10(a) states:

> [N]o discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, *so long as the alternative does not have other significant adverse environmental consequences.*

(Emphasis added.) This regulation adds the additional requirement that a practicable alternative not have adverse environmental consequences, and it is consistent with the description of practicable alternatives given in subsection (a)(2) of the regulation. That description notes that "[a]n alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2). Thus, although the "practicable" nature of an alternative relates to its feasibility in the eyes of an applicant, it does not encompass public environmental considerations which remain part of the Corps' permitting responsibility. The presumption, therefore, serves only to relieve the applicant of the burden of showing that it has the means to implement the project at the alternative site. In the instant case, the Corps justifiably requested additional documenta-

tion from the plaintiff. The Corps needed specific information which would allow for an informed, considered analysis of the environmental impact which would result from development of the alternative sites. This request was consistent with the purpose and scope of the Corps' regulatory function. *See* 33 C.F.R. § 320.1(a) (1991) ("As a result of several new laws and judicial decisions, the [Corps' regulatory] program has evolved to one involving the consideration of the full public interest by balancing the favorable impacts against the detrimental impacts.").

Alternatively, plaintiff claims that, in Lakewood's case, "[f]utility excuses the normal requirement for finality as a prerequisite for judicial review of agency action." To obtain and submit the additional information which the Corps requested, plaintiff argues it would have cost hundreds of thousands of dollars, would have taken several years, and would have done nothing to advance Lakewood's permit application to either approval or denial.

 Plaintiff is correct that, while a property owner must seek a final determination on its permit application, he or she is not required to resort to "piecemeal litigation or otherwise unfair procedures." *See Mac-Donald, Sommer & Frates v. County of Yolo,* 477 U.S. at 350 n. 7, 106 S.Ct. 2561. Thus, an application for a permit is unnecessary if a plaintiff can establish that "the procedure to acquire a permit is so burdensome as to effectively deprive plaintiffs of their property rights." *Hage v. United States,* 35 Fed.Cl. 147, 164 (1996).

 Plaintiff, however, has failed to establish that its continuance in the permitting process would have been futile. Plaintiff claims that "[c]ompliance with [the Corps'] requests for information would have been burdensome in terms of time and money and served no legitimate permitting purpose." The court does not agree. The Corps requested information on the practicable alternative sites which plaintiff alleged to be available. Specifically, the Corps' April 29, 1991 letter to Lakewood stated that those alternatives had to be "evaluated as part of the permit review process." Among other docu-

mentation, the Corps requested that plaintiff provide:

A detailed alternatives analysis that objectively evaluates the feasibility of utilizing the upland portions of your existing property (avoidance), the minimization of encroachment into waters of the United States and associated wetlands, and/or the use of other existing upland parcels to achieve the project's purpose ...

As demonstrated above, the Corps has a responsibility to evaluate the practicable alternatives to ensure that they do "not have other significant adverse environmental consequences." *See* 40 C.F.R. § 230.10(a). Toward that end, the Corps solicits public commentary on permit applications. On March 19, 1991, in response to the Corps' Joint Federal/State Public Notice concerning Lakewood's application, the Virginia State Water Control Board put forth official comments in a letter to the Corps. In its comments, the SWCB suggested that "a thorough alternatives analysis and documentation of how the applicant has tried to avoid and minimize wetland impacts should be submitted." The United States Fish and Wildlife Service similarly responded to the Public Notice by mail on March 29, 1991, and, like the SWCB, requested that an alternatives analysis be required by the Corps.

On April 5, 1991, the EPA also voiced concern to the Corps that additional information was needed from Lakewood. In a letter to the Corps, the Chief of EPA's Wetlands Section stated that plaintiff's § 404 permit lacked "critical information." In part, the letter requested that:

[Lakewood] submit a detailed alternatives analysis and develop further environmental information on the wetlands proposed to be filled by the project. That information should include, at a minimum a detailed wetland delineation of the property, a detailed description of the various wetland vegetative communities, an analysis of the function and value of those wetlands and any attempts made to avoid or minimize adverse impacts. Only after all attempts have been made to avoid and minimize adverse impacts can wetlands compensation be considered.

Thus, the SWCB, the Fish and Wildlife Service, the EPA and the Corps all requested that Lakewood provide additional information concerning the practicable alternatives. Plaintiff's claim that there was "no legitimate permitting purpose" for this information is not convincing in light of the facts that (1) the information was requested by four different state and federal regulatory agencies, and (2) all indicated that the information would facilitate the determination of whether the alternatives would have adverse environmental consequences.

Regarding plaintiff's claim of the extensive time and expense which allegedly would have been required to gather the information, these are problems which are not unique to plaintiff. Moreover, the plaintiff has not provided any information to bolster its argument that the agency requests were unwarranted. Although the court certainly hopes the information sought was not unduly burdensome, mere allegations are clearly insufficient to support plaintiff's claim. Similarly, plaintiff's allegations of the futility of the permitting process also find no support in the record before the court and do not establish plaintiff's position.

It is instructive to consider the case of *Howard W. Heck and Assocs., Inc. v. United States,* 37 Fed.Cl. 245 (1997) (*Heck*), aff'd, 134 F.3d 1468 (Fed.Cir.1998), which presents a factual situation similar to the case at bar. In *Heck,* a plaintiff refused to perform an alternatives analysis requested by the New Jersey Department of Environmental Protection during the plaintiff's § 404 permitting process. *Heck,* 37 Fed.Cl. at 248. As state approval was a necessary prerequisite to obtaining a § 404 permit, the Corps later canceled the plaintiff's application and the plaintiff filed suit for a taking. *Id.* at 249. The plaintiff in *Heck* argued that its claim was ripe because the Corps' denial of the § 404 permit application was a "certainty," regardless of whether the state had provided its

certification. *Id.* at 252. The court, however, rejected this futility argument and dismissed the case as unripe for adjudication because no substantive agency determination had been made on the plaintiff's permit application. *Id.* at 256. The court stated:

> What plaintiff's argument fails to acknowledge is that a difficult position does not necessarily equal a futile position. Even assuming that section 404's presumptions against developments that are "not water dependent" significantly lessened the likelihood that plaintiff would secure a permit, such a showing would still not give rise to a legitimate futility claim. Neither would the issuance of negative recommendations from other federal agencies....

> * * *

> A plaintiff cannot plead futility whenever faced with long odds or demanding procedural requirements. Administrative obstacles to the securing of a permit—such as negative agency comments or statutory presumptions—do not automatically exonerate a plaintiff from all responsibility to see the application process through to its end.

*Id.* at 252.[8]

In conclusion, the Court of Federal Claims in *Heck* stated, "[T]he court is left with a plaintiff who short-circuited the normal administrative processes by refusing to comply with legitimate procedural requirements, and who now seeks to recover for the 'loss' of a piece of property about which no substantive agency determination has yet been made."

Lakewood's situation is analogous to that of the *Heck* plaintiff. While the responses which Lakewood received might not have been encouraging, the thrust of the message communicated to the plaintiff was that both state and federal agencies required additional information, without any definitive indication that a development permit for the Elbow

---

**8.** On appeal, the United States Court of Appeals for the Federal Circuit further clarified that "the futility exception simply serves 'to protect property owners from being required to submit *multiple* applications when the manner in which the first application *was rejected* makes it clear that no project will be approved.'" *Howard W. Heck,*

*and Assocs., Inc. v. United States,* 134 F.3d at 1472 (citing *Southern Pac. Transp. Co. v. City of Los Angeles,* 922 F.2d 498, 504 (9th Cir.1990), cert. denied, 502 U.S. 943, 112 S.Ct. 382, 116 L.Ed.2d 333 (1991)) (emphasis added by Federal Circuit Court of Appeals).

Lake Property and the Boy Scout Tract could not have been obtained. While the parties have stipulated that development solely on the upland portions of plaintiff's property would not be economically feasible, the court notes that Lakewood failed to proffer any wetland mitigation packages in its original permit application. The Corps has not foreclosed the possibility of development on some of the subject properties' wetlands in return for the creation of wetlands on other properties.[9] Also weighing against Lakewood's claim of futility is the fact that plaintiff's claim of futility in *Heck* was denied even though that plaintiff had actually submitted more requested information, in contrast to Lakewood. *See id.* at 247. As stated in *Heck,* while perhaps "faced with long odds or demanding procedural requirements," Lakewood has not demonstrated futility to this court. *See id.* at 252.

 In addition, another federal court has previously ruled against Lakewood in regards to its futility contention. *See Robert G. Moore and Frances R. Moore v. United States,* 943 F.Supp. 603 (E.D.Va.1996). Thus, defendant argues that "plaintiff is collaterally estopped from arguing that it was futile to participate in the permitting process." The related doctrines of collateral estoppel (issue preclusion) and res judicata (claim preclusion) were summarized by the United States Supreme Court as follows:

A fundamental precept of common-law adjudication, embodied in the related doctrines of collateral estoppel and *res judicata,* is that a "right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction ... cannot be disputed in a subsequent suit between the same parties or their privies ...." *Southern Pacific R. Co. v. United States,* 168 U.S. 1, 48–49, 18 S.Ct. 18, 42 L.Ed. 355 (1897). Under *res judicata,* a final judgment on the merits bars further claims by parties or their privies based on the same cause of action. *Cromwell v. County of Sac,* 94 U.S. 351, 352, 24 L.Ed.

195 (1877); *Lawlor v. National Screen Service Corp.,* 349 U.S. 322, 326, 75 S.Ct. 865, 99 L.Ed. 1122 (1955); 1B J. Moore, Federal Practice ¶ 0.405[1], pp. 621–624 (2d ed.1974) (hereinafter 1B Moore); Restatement (Second) of Judgments § 47 (Tent. Draft No. 1, Mar. 28, 1973) (merger); *id.,* § 48(bar). Under collateral estoppel, once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation. *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979); Scott, Collateral Estoppel by Judgment, 56 Harv. L.Rev. 1, 2–3 (1942); Restatement (Second) of Judgments § 68 (Tent. Draft No. 4, Apr. 15, 1977) (issue preclusion). Application of both doctrines is central to the purpose for which civil courts have been established, the conclusive resolution of disputes within their jurisdictions. *Southern Pacific R. Co., supra,* at 49, 18 S.Ct. 18; *Hart Steel Co. v. Railroad Supply Co.,* 244 U.S. 294, 299, 37 S.Ct. 506, 61 L.Ed. 1148 (1917). To preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions.

*Montana v. United States,* 440 U.S. 147, 153–54, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979) (footnote omitted). Thus, the doctrines of res judicata and collateral estoppel operate to prevent the relitigation of a claim or issue that has already had its day in court. As noted, by affording a claimant only one opportunity to obtain redress, the doctrines conserve judicial resources, foster reliance upon judicial decisions, and protect litigants from vexatious and needless litigation. *Comair Rotron, Inc. v. Nippon Densan Corp.,* 49 F.3d 1535, 1537 (Fed.Cir.1995); *In re*

---

**9.** *See Greenbrier (Lake County Trust Co. No. 1391) v. United States,* 40 Fed.Cl. 689, 702 (1998) ("After making a proper application to the governmental decision maker, ripeness doctrine also requires that a property owner whose proposed use has been denied utilize any variance or similar procedure by which approval could be given for a modified use, ...."), *aff'd,* 193 F.3d 1348 (Fed.Cir.1999).

*Freeman,* 30 F.3d 1459, 1465–68 (Fed.Cir. 1994); *Martin v. United States,* 30 Fed.Cl. 542, 546, *aff'd,* 41 F.3d 1519, 1994 WL 623212 (Fed.Cir.1994) (table); *Mark Smith Constr. Co. v. United States,* 15 Cl.Ct. 32, 35–36 (1988).

■■■■ In this regard, the United States Court of Appeals for the Federal Circuit has stated the relevant test for issue preclusion:

The doctrine of collateral estoppel, also called issue preclusion, bars parties to a prior lawsuit from relitigating any issues that were actually and necessarily determined by a court of competent jurisdiction in the prior suit. *Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 649 n. 5, 58 L.Ed.2d 552 (1979). The doctrine serves "the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation." *Id.* at 326, 99 S.Ct. at 649. Affording a litigant more than one full and fair opportunity for judicial resolution of the same issue results in an untenable misallocation of resources. *Blonder–Tongue Labs., Inc. v. University of Ill. Found.,* 402 U.S. 313, 328–29, 91 S.Ct. 1434, 1442–43, 28 L.Ed.2d 788 (1971).

Collateral estoppel is appropriate only if: (1) the issue to be decided is identical to one decided in the first action; (2) the issue was actually litigated in the first action; (3) resolution of the issue was essential to a final judgment in the first action; and (4) the parties had a full and fair opportunity to litigate the issue in the first action. *Mother's Restaurant, Inc. v. Mama's Pizza, Inc.,* 723 F.2d 1566, 1569, 221 USPQ 394, 397 (Fed.Cir.1983).

*Arkla, Inc. v. U.S.,* 37 F.3d 621, 623–24 (Fed. Cir.1994), *cert. denied sub nom. NorAm Energy Corp. v. United States,* 514 U.S. 1035, 115 S.Ct. 1399, 131 L.Ed.2d 287 (1995). *See also In re Freeman,* 30 F.3d at 1465–67. "Factual differences must be material, i.e., having legal significance, to prevent operation of collateral estoppel." *Arkla, Inc. v. U.S.,* 37 F.3d at 625 (citing *Montana v. United States,* 440 U.S. at 162, 99 S.Ct. 970).

■■■ "[T]he defense of collateral estoppel based on a final judgment . . . in another suit can 'be timely made at any stage of the affected proceedings.' *Dana Corp. v. NOK [, Inc.*], 882 F.2d [505, 507 (Fed.Cir.1989)]." *Mendenhall v. Barber–Greene Co.,* 26 F.3d 1573, 1580 (Fed.Cir.1994) (corrected on rehearing), *cert. denied sub nom. Mendenhall v. Astec Indus., Inc.,* 513 U.S. 1018, 115 S.Ct. 582, 130 L.Ed.2d 496 (1994) (balance of citations omitted). The United States Court of Appeals for the Federal Circuit also has spoken to the degree of finality of an earlier decision which is necessary in order to invoke collateral estoppel, as follows:

A determination is conclusive in a subsequent action between the same parties only when the "issue of fact or law is actually litigated and determined by a valid and final judgment." Restatement (Second) of Judgments § 27 (1982) (emphasis added). *See also Young Engineers, Inc. v. U.S. Int'l Trade Comm'n,* 721 F.2d 1305, 219 USPQ 1142 (Fed.Cir. 1983). One important factor that is considered in determining the finality of a decision for the purposes of preclusion is whether the decision was ever subject to appeal. *Lummus Co. v. Commonwealth Oil Refining Co.,* 297 F.2d 80, 89 (2d Cir.1961), *cert. denied,* 368 U.S. 986, 82 S.Ct. 601, 7 L.Ed.2d 524 (1962). In *Lummus Co.,* 297 F.2d at 89, Judge Friendly stated that whether a "nonfinal" judgment "ought nonetheless be considered 'final' in the sense of precluding further litigation of the same issue, turns upon such factors as the nature of the decision (i.e., that it was not avowedly tentative), the adequacy of the hearing, and the opportunity for review." *See also Miller Brewing Co. v. Jos. Schlitz Brewing Co.,* 605 F.2d 990, 996 (7th Cir.1979), *cert. denied,* 444 U.S. 1102, 100 S.Ct. 1067, 62 L.Ed.2d 787 (1980). The Restatement (Second) of Judgments § 13 comment g (1982) also indicates that a decision that is not subject to appeal is not final for the purposes of issue preclusion. *See also Interconnect Planning Corp. v. Feil,* 774 F.2d 1132, 227 USPQ 543 (Fed.Cir. 1985).

*Block v. U.S. Int'l Trade Comm'n,* 777 F.2d 1568, 1571–72 (Fed.Cir.1985).

While defendant alleges that "[a]ll of the elements required for the application of collateral estoppel are present in this case," Lakewood disagrees and states that several factors are not present:

First, the issue in the district court, the occurrence of a loss marked by an identifiable event and a completed transaction for which there was no reasonable prospect of recovery, is different from the issue in this controversy, a constitutional taking. Second, *Moore* concerned a separate tract of land owned personally by the Moores rather than the Lakewood property which is at issue in this case. Third, although Lakewood's wetlands permit application included both the Moores' property and the adjoining Lakewood tract, Lakewood did not have the opportunity to litigate futility in *Moore* since it had not paid taxes allowing it to sue for a refund and therefore lacked standing to intervene.

As noted above, the Federal Circuit Court of Appeals has articulated four elements which should be present for issue preclusion: (1) the issue was previously litigated, (2) the issue's resolution was essential in the prior litigation, (3) the parties had a full and fair opportunity to litigate the issue previously, and (4) the identical issue was decided previously. *See Mother's Restaurant, Inc. v. Mama's Pizza, Inc.*, 723 F.2d at 1569. Plaintiff is correct that the District Court for the Eastern District of Virginia was chiefly trying to identify whether the Moores had made a proper deduction in their federal taxes for an involuntary conversion loss. *See Robert G. Moore and Frances R. Moore v. United States*, 943 F.Supp. at 608. In order for the district court to decide that issue, however, the court necessarily had to decide whether the loss had actually taken place and had to address the futility issue. *See id.* (citing Treas. Reg. § 1.165–1(b)). Thus, the federal court in *Moore* stated:

Although it is a tax case, the resolution of the present case revolves around the regulatory takings issue. The Moores argue that the identifiable event which gave rise to their claimed involuntary conversion was the enactment of the 1989 Manual and the 1989 Memorandum Agreement, which effected a regulatory taking of the Boy Scout Tract because it led to a ninety-seven percent (97%) diminution in the value of that tract. In addition, the Moores argue that there was no reasonable prospect of recovery for their loss because a denial of a § 404 permit is a prerequisite to an inverse condemnation suit in the Court of Federal Claims and their environmental consultants advised them that the Corps had a practice of never formally denying § 404 permits with wetland impacts on the order of magnitude involved in the proposed development of the Boy Scout Tract.

*Id.* at 610–11 (citation to the record omitted).

As defined in *Mother's Restaurant, Inc. v. Mama's Pizza, Inc.*, 723 F.2d at 1569, determination of the futility/ripeness issue was essential to the court's decision in *Moore*. The court in *Moore* explicitly noted that "[a]s a threshold matter, the Court must determine whether the Moores' claim is premature because they were never formally denied a § 404 permit." *Robert G. Moore and Frances R. Moore v. United States*, 943 F.Supp. at 611. An examination of the ripeness issue was necessary because "the Government maintain[ed] that the Moores' claim [was] premature because they failed to complete the § 404 permit process so as to establish a regulatory taking of the Boy Scout Tract." *Id.* at 611.

The case of *Mother's Restaurant, Inc. v. Mama's Pizza, Inc.*, 723 F.2d at 1569, also requires that "the parties had a full and fair opportunity to litigate the issue in the first action." Plaintiff argues that this element is not met because "Lakewood did not have the opportunity to litigate futility in *Moore* since it had not paid taxes allowing it to sue for a refund and therefore lacked standing to intervene." In the prior case, the Moores needed to show that a taking of the Boy Scout Property had occurred so they could deduct the value of their loss on their federal tax return. Because the issue of the ripeness of that taking claim was raised by the government as a jurisdictional defense, the Moores attempted to prove that it would have been futile to continue the permitting process. *See Robert G. Moore and Frances*

*R. Moore v. United States,* 943 F.Supp. at 611–12. In the instant case, plaintiff is trying to prove a taking of both the Boy Scout Tract and the Elbow Lake Property.[10] The government, similar to its position in the district court, again is challenging the ripeness of plaintiff's taking claim, and Lakewood, like the plaintiffs in *Moore,* is arguing that continuation of the permitting process would have been futile. While Lakewood may not have been a named party in *Moore,* the arguments which Lakewood would have raised if it could have intervened are the same as those which were raised by the Moores. Defendant argues regarding the two cases that "the exact same permit application is involved for the exact same property, counsel is the same in both cases, and, as stated before, the same witnesses who testified in *Moore* are witnesses in this case." [11]

From the opinion in *Moore,* it is clear that the court rendered a decision on the identical futility issue, meeting the last of the four requirements for collateral estoppel in *Mother's Restaurant, Inc. v. Mama's Pizza, Inc.,* 723 F.2d at 1569. In pertinent part, the District Court for the Eastern District of Virginia stated:

> [T]he Court cannot agree that the futility exception applies under the facts and circumstances of the present case. The Moores certainly did not complete one meaningful § 404 application. In fact, the record indicates that the Moores failed to respond to the Corps' first request for information to supplement their initial permit application.... Moreover, considering the case law which has addressed the validity of the § 404 permit process, the Court cannot agree that the permit process would have resulted in an unreasonable, extraordinary, excessive or considerable delay, or that a permit refusal was inevitable.... The Court is especially re-

luctant to apply the futility exception in light of the fact that "Government officials are presumed to carry out their duties in good faith, and it takes 'well-nigh irrefragable proof' to overcome this presumption." *Dufau [v. United States* ], 22 Cl.Ct. [156,] 164 (citation omitted); *see also Gilbert [v. City of Cambridge* ], 932 F.2d [51,] 61 ("Since obtaining a final [agency] decision should be the rule, . . . the burden of establishing futility must lie with the party seeking to bypass the permit procedure— and any reasonable doubt ought to be resolved against that party."). Therefore, the Court FINDS that the futility exception does not excuse the Moores from failing to pursue a § 404 permit before pursuing their regulatory taking claim.

*Robert G. Moore and Frances R. Moore v. United States,* 943 F.Supp. at 613–14. Thus, although this court independently concludes that Lakewood has failed to demonstrate that further participation in the permitting process would have been futile, defendant's estoppel argument is a reasonable one based upon the previous decision on the same issue by the United States District Court for the Eastern District of Virginia in the *Moore* case. Because defendant's estoppel argument is somewhat weakened by the different, albeit overlapping, plaintiffs, and by the different, albeit interrelated, property tracts involved, this court chooses to rely on its independent finding that plaintiff's futility argument fails.

## CONCLUSION

After thoroughly reviewing the record and carefully considering the arguments submitted by both parties, this court holds that plaintiff's takings claim is not ripe for judicial review. Lakewood did not receive a final agency decision regarding its § 404 permit

**10.** The court notes that the plaintiff submitted a Joint Application for a § 404 permit, and that the permitting process proceeded simultaneously for both the Boy Scout Tract and the Elbow Lake Property.

**11.** Plaintiff Lakewood's claim that it was not afforded an opportunity to litigate futility in the *Moore* case is somewhat strained, even if the

cases are differently captioned, given that R.G. Moore is the managing general partner of Lakewood. Regarding whether the "exact same property" is involved as alleged by the defendant, the tax case addressed only the Boy Scout Tract, although, as noted above, the permitting process addressed both the Boy Scout Tract and the Elbow Lake Property.

application, and the plaintiff has not persuaded the court that continuation with the permitting process would have been futile. Accordingly, defendant's motion to dismiss for lack of jurisdiction is **GRANTED**. Absent jurisdiction, the court cannot reach a decision on the merits of plaintiff's takings claim, and, thus, the court will make no determination with respect to the cross-motions for summary judgment.[12]

**IT IS SO ORDERED.**

12. The court notes, however, that were plaintiff's claim ripe for review at this time, the record before the court suggests that because the property in question was zoned only for agricultural use at the time of purchase, and because plaintiff has not persuasively argued that it would have been able to secure a change to residential zoning, a failure by the Corps to grant a § 404 wetlands development permit would not appear to have taken anything of value from Lakewood, as no residential development of the property was permissible at the time of the alleged taking.